# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMAN SOUDANI, | Civil Action No.: 23-cv-9905 |
| Plaintiff, | **AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| MOUT'Z SOUDANI, | |
| Defendant. | |

Plaintiff, Eman Soudani ("Plaintiff"), by and through her undersigned counsel, respectfully states and alleges as follows:

## NATURE OF THE ACTION

1.      For over 45 years, from on or about August 1977 until October 2022 (the "Relevant Period"), Plaintiff was the victim of horrific physical, emotional, and incestuous sexual abuse by her brother, Defendant Mout'z Soudani ("Soudani").

2.      Soudani forcibly took Plaintiff's virginity in 1977, when she was 17, just months after she first arrived in the United States from Jordan. He continued to treat her as a sexual slave for decades, until October 2022, when Plaintiff finally escaped Soudani's domination.

3.      Throughout the Relevant Period, which spans Plaintiff's entire adult life, Soudani forced and coerced Plaintiff to engage in violent sexual contact, including anal and vaginal intercourse. Soudani carried out his sexual attacks against Plaintiff using forcible compulsion, undue influence, overt threats, duress, coercion, physical force, and intimidation.

4.      Soudani also threatened and inflicted physical violence against Plaintiff, his own children and Plaintiff's child. On a regular basis, Soudani threatened to "beat the sh-t" out of Plaintiff and the children unless they complied with his directives, and often made good on the

1

threat. During the period of the children's minority, Plaintiff observed Soudani hit the children with his hands or hard objects, causing the children to suffer intense pain, physical injury, and significant emotional distress. When Soudani bothered with a pretext to beat Plaintiff, he often claimed that Plaintiff had disobeyed him or failed to live up to his expectations.

5.      During the Relevant Period, Plaintiff believed that Soudani had murdered two women to whom he was married to recover insurance proceeds. She also observed Soudani threaten to kill Plaintiff's son on multiple occasions and, more than once, saw Soudani point a gun that she believed to be loaded at her and at her son.

6.      During the Relevant Period, Soudani socially isolated Plaintiff from others, using his position of power over Plaintiff to deny her educational opportunities, stunt her social life, steal her money, and keep her in constant fear and compliant with his demands. On a regular basis, Soudani called Plaintiff a "whore" or another pejorative and threatened to beat her if she tried to make friends outside the home, thus denying Plaintiff the chance to make close friends she could rely on to provide a cultural context for Soudani's conduct or otherwise serve as confidants. Soudani's ability to engineer Plaintiff's isolation during the Relevant Period, beginning when she was just 17, resulted in what Soudani sought: for Plaintiff to remain under his control and to keep silent about his abhorrent conduct.

7.      During the Relevant Period, Soudani subjected Plaintiff to economic servitude, further isolating her and making it less likely that Plaintiff could ever leave him or report his abuse. He forced Plaintiff to work without pay at various business establishments that he owned or controlled. He also misappropriated Plaintiff's money, including her wages, child support payments, Social Security disability payments, and more than $60,000 that Plaintiff received in a lawsuit settlement.

8.      During the Relevant Period, Plaintiff lived in a state of constant fear and shame for herself and her family because of Soudani's conduct. Plaintiff feared that if she reported Soudani's conduct to authorities no one would believe her, and that making a report would risk putting herself and the children at risk of retaliation and even worse treatment, including but not limited to the fear that Soudani would kill them.

9.      In or about 1989, Soudani impregnated Plaintiff. Plaintiff had an abortion. She suffered multiple and lasting complications from the abortion, including hemorrhaging blood and, thereafter, substantial and chronic pain in her vaginal and reproductive organs.

10.     Plaintiff was unable to free herself from Soudani's domination and control until October 2022, when she fled New York with her son and moved to Colorado to live near Soudani's son. Soudani's son was also a victim of his abuse and had left New York for Colorado at a young age to escape Soudani.

11.     The last time that Soudani brutally raped Plaintiff was just days before Plaintiff left to move to Colorado. Soudani was drunk. The October 2022 rape, coupled with escalated threats of violence against her son by Soudani, solidified Plaintiff's fear for her son's life and fortified her decision to move to Colorado. Not long after she moved to Colorado, she began for the first time to communicate with others about her long-term abuse.

12.     After Plaintiff moved to Colorado, she was horrified to learn that Soudani had sexually abused both his son and her son during the Relevant Period, causing her to suffer additional emotional distress.

13.     Soudani's sexual conduct during the Relevant Period constituted a sexual offense against Plaintiff, in violation of Article 130 and Article 255 of the New York Penal Law, or a predecessor statute that prohibited such conduct at the time of the act, and resulted in physical,

psychological, and emotional injuries, during a period when she was at least 18 years old. Specifically, the sexual abuse Plaintiff endured constituted sexual misconduct (N.Y. Penal Law § 130.20), rape (N.Y. Penal Law §§ 130.25–130.35), criminal sexual acts (N.Y. Penal Law §§ 130.40–130.50), forcible touching (N.Y. Penal Law § 130.52), and/or sexual abuse (N.Y. Penal Law §§ 130.53–130.70), and incest (N.Y Penal Law §§ 255.25-27).

14.    This action, seeking recourse for the horrendous physical, psychological, and emotional injuries and economic damages caused by Soudani, is brought pursuant to the Adult Survivors Act, New York Civil Practice and Rules ("CPLR") § 214-j, which revives the claims set forth below to the extent they might be otherwise barred by a statute of limitations.[1]

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the causes of action asserted in this Amended Complaint pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interests and costs and there is complete diversity of citizenship between Plaintiff, domiciled in Colorado, and Soudani, a resident of the State of New York.

16.    Venue is proper pursuant to 28 U.S.C. § 1391(b) in that all or a substantial part of the events or omissions forming the basis of these claims occurred in Rockland and Orange Counties, New York, which are within the Southern District of New York.

## PARTIES

17.    Plaintiff Eman Soudani is a resident and domiciliary of Arapahoe County, Colorado. From 1977 until October 2022, Plaintiff was a resident of New York, living in Rockland County and then Orange County—most of that time in the same house as Defendant

---

[1] Pursuant to CPLR § 214-j, the filing of a notice of claim or a notice of intention to file a claim is not a condition precedent to commencement of this action and a claim brought pursuant to CPLR § 214-j is not barred by any statute of limitations.

Mout'z Soudani. In October 2022, to escape long-term psychological, physical, and sexual abuse by her brother, Defendant Mout'z Soudani, she left New York and moved to Colorado.

18.    Defendant Mout'z Soudani  is  an adult who is domiciled in the State of New York. He has lived living at 40 Bailey Road, Montgomery, New York, for over 30 years and has lived in the State of New York for more than 40 years. He is 74 years old.

## FACTUAL ALLEGATIONS

### A.  1977-1983: Plaintiff Moves in with Soudani and Begins to Endure Abuse

19.    In August 1977, Plaintiff was 17 years old. At Soudani's suggestion and in response to his promise of an education and better life in the United States, Plaintiff emigrated from Jordan to the United States to live with Soudani, in Spring Valley, New York, in Rockland County.

20.    Plaintiff is now fluent in English, but when she first moved to the United States her command of the English language was limited.

21.    At that time, in August 1977, Soudani was married to his then-wife Helen and had three sons. He also had two daughters from a prior marriage who lived with their mother. He was the owner of a local business—a restaurant in Rockland County.

22.    In late August or early September 1977, Plaintiff started to attend high school in Rockland County.

23.    Later in September 1977, Soudani's then-wife, Helen, was brutally murdered and found dead outside the restaurant that Soudani owned. Contemporary press accounts reported that Soudani was considered a suspect in the murder and had killed Helen to recover insurance proceeds. No one was ever arrested for Helen's murder.

24.    At Soudani's instruction, Plaintiff provided the police with a false alibi statement

regarding Soudani's whereabouts on the night of the murder. She did so because Soudani threatened to beat her severely if she refused. This act is the foundation of the fear and isolation that caused Plaintiff to remain with Soudani until October 2022 – in her mind Helen's death provided a clear model of what would happen if she crossed Soudani.

25.    After Soudani's wife Helen was killed, in September 1977, Plaintiff dropped out of high school to care for Soudani's three sons. At the age of 17, she became the primary caregiver to the children and served as such throughout their childhood. Soudani was the only other adult in the residence.

26.    About two or three months after his wife's murder, Soudani climbed into Plaintiff's bed while she was asleep and got on top of her. His penis was exposed. He touched her under her underwear. Plaintiff pushed him off and shouted, in substance, in Arabic, "what are you doing?" Soudani replied, in substance, in Arabic, "I'm sorry, I thought you were Helen [Soudani's deceased wife]."

27.    Plaintiff confronted Soudani about what happened the next day. Soudani denied what had occurred, told Plaintiff that it was her imagination, and ordered her not to disagree with him in the future. Plaintiff was in fear of Soudani; she believed based on Soudani's reaction that Soudani would beat her if she disobeyed him or send her back to Jordan. She also was in fear of Soudani because she believed that Soudani had killed Helen.

28.    About a week or two thereafter, Soudani again climbed into Plaintiff's bed while she slept. His penis was exposed. Plaintiff struggled with him as he forcibly removed her underwear. Soudani ejaculated onto Plaintiff and then passed out in the bed.

29.    Plaintiff again confronted Soudani to determine why he was subjecting her to this sexual behavior. In response, Soudani struck Plaintiff with his hands on her arms and the back

of her head, causing her pain and suffering, and threatened to kill her. He told her that no one would believe her if she told anyone about what had happened. He also told her that she brought him bad luck, and was a "jinx," because his wife died shortly after Plaintiff arrived in the United States.

30.    In or about February 1978, Soudani for the first time forced Plaintiff to have sexual intercourse. He did so by forcible compulsion: by using physical force and by placing Plaintiff in fear of physical injury. Plaintiff was 17 years old and a virgin.

31.    Afterwards Soudani told Plaintiff, in substance, "It's your fault that Helen [Soudani's deceased wife] is dead, this is the price you have to pay." Soudani again warned her not to tell anyone what had happened, or he would beat her. Plaintiff believed Soudani's threat and did not make a report.

32.    As a result of the rape, Plaintiff suffered physical pain, bleeding, and soreness. Plaintiff was also in despair: she believed that her life was ruined because no one would ever agree to marry her because she was no longer a virgin. Plaintiff's shame because she was no longer a virgin and, in her mind, no longer acceptable for marriage, as well as the threat of retaliatory physical harm to her and the children, made it impossible for her to report what had happened.

33.    From 1977 until 1983, and throughout the Relevant Period, Soudani subjected Plaintiff to frequent physical violence and unwanted sexual contact and abuse by forcible compulsion within the meaning of N.Y. Penal Law § 130.00(8), including repeated unwanted vaginal and anal sexual intercourse. Plaintiff was compelled by express or implied threat from Soudani to engage in these unwanted and abusive sexual acts, and she feared death or physical injury to herself or another person, to wit, the children, if she disobeyed Soudani.

34.     During this period, from 1977 to 1983, and throughout the part of the Relevant Period that encompassed the years of the children's minority, Plaintiff observed Soudani subject his three children to regular physical and psychological abuse, including screaming insults at the children, throwing physical objects at them, throwing them across rooms, and, on one occasion, holding one of the children by his feet and dunking his head in the toilet.

35.     Plaintiff bore Soudani's sexual, physical, and psychological abuse, and did not leave because she did not want to abandon the three young children for whom she had suddenly become the primary caregiver with a person whom she considered to be a monster. She also believed that no one would believe her if she reported Soudani's conduct and feared that Soudani's regular and horrific beatings of the children would escalate if she caused trouble.

36.     In 1981, Soudani sold the Rockland County restaurant and moved with his sons and Plaintiff from Rockland County to 40 Bailey Road in Orange County, New York.

37.     Soudani's psychological control of and sexual attacks on Plaintiff continued at the 40 Bailey Road residence.

**B. 1983-1985: Plaintiff Marries Elkarim but Continues to Endure Abuse from Soudani**

38.     In or about 1982, Soudani brought an Egyptian man to the residence named Mohammed Elkarim ("Elkarim") and told Plaintiff that she would marry him.

39.     At the time, Elkarim was not a United States citizen. Plaintiff had a green card; she eventually became a United States citizen.

40.     Soudani lied to Elkarim about whether Plaintiff was a virgin, telling Elkarim in substance that Plaintiff "may not be a virgin" because doctors had to put tubes in her vagina when she was ill. In truth and fact, and as Soudani well knew, Plaintiff was not a virgin because Soudani raped her.

41.    Prior to their marriage, Soudani did not allow Elkarim and Plaintiff to spend time alone together.

42.    Despite Elkarim being for all intents and purposes a stranger, Plaintiff agreed to marry him to get away from Soudani, thinking that her marriage would stop Soudani's physical and sexual assaults. It did not.

43.    In 1983, Plaintiff married Elkarim and moved into an apartment with him that was located about five minutes' drive from the 40 Bailey Road residence. However, even after her marriage, Soudani demanded that Plaintiff return to the 40 Bailey Road residence on an almost daily basis to care for his three children and to clean his house.

44.    During her marriage to Elkarim, Soudani continued to force Plaintiff to have unwanted sexual intercourse with him by forcible compulsion, both at the 40 Bailey Road residence and at the apartment where Plaintiff lived with Elkarim. He also repeatedly made sexually charged remarks to Plaintiff's husband, including demanding to know about his sexual relations with Plaintiff. Defendant asked Elkarim, "How was she?" and "How are you doing sexually with [Plaintiff]."

45.    In or about late 1984, Plaintiff became pregnant.

46.    At some point in 1984, during Plaintiff's pregnancy, Soudani approached Elkarim at his place of work and physically assaulted him. The attack reinforced Soudani's domination and control of Plaintiff – his violent reaction against her husband when she was pregnant solidified her belief that she would be harmed or killed if she disobeyed Soudani or reported his conduct.

47.    Prior to the birth of her son in August 1985, Elkarim abandoned Plaintiff. Plaintiff believes Elkarim left her because of Soudani's constant badgering of Elkarim about his sexual

9

relations with Plaintiff and Soudani's physical assault of Elkarim.

### C. 1986-2022: Plaintiff Moves Back in with Soudani and Endures Years of Sexual and Physical Abuse

48.     In early 1986, Plaintiff returned to the 40 Bailey Road residence and lived there with her son and Soudani until October 2022. Plaintiff returned because she had no income, little education, no marketable skills, and she remained the primary caregiver to Soudani's three sons and to her own son. In short, Plaintiff believed she had nowhere else to go.

49.     During this period, Soudani exercised dominion and control over all aspects of Plaintiff's life. He regularly humiliated Plaintiff by criticizing her choice of clothing, and by calling her a "whore" and other pejoratives.

50.     Plaintiff felt helpless to escape Soudani's control. She had never lived independently and believed that she could not do so given her divorce and lack of formal education. She also feared for the children's safety, including that of her son, and was concerned that no one would protect them from Soudani if she left.

51.     Plaintiff's son remained economically dependent on Soudani for most of his life and lived with Soudani and Plaintiff at the 40 Bailey Road residence for most of the Relevant Period. Plaintiff remained fearful throughout the Relevant Period that if she disobeyed or angered Soudani, he would punish her son. As discussed below, towards the end of the Relevant Period, Plaintiff observed Soudani threaten to kill her son, and feared that Soudani indeed planned to kill him.

### i.     Soudani Continues to Physically and Sexually Abuse Plaintiff

52.     From 1985 to October 2022, Soudani continued to abuse Plaintiff sexually and physically on a regular basis, including by forcing her to have unwanted vaginal and anal sexual intercourse by forcible compulsion.

53.    Throughout the period, Soudani became angry and physically abusive on a regular basis, particularly if he perceived that Plaintiff had somehow insulted him, questioned a decision of his, or sought to provide input in family affairs. She endured severe physical abuse, causing her physical pain and suffering, even for minor infractions such as if Soudani believed the house was not clean enough.

54.    The abuse was unrelenting and persisted both when Soudani remarried and when he had dalliances with other women.

55.    In or about 1987, Soudani brought another woman, Elizabeth Ruttkay ("Ruttkay"), into the 40 Bailey Road residence. Ruttkay was about 10 years older than Soudani and did not share Soudani's bedroom with him at the time. Ruttkay had known Soudani for a long time, going back to when Soudani lived in Rockland County, and had been involved in the restaurant that Soudani had operated. In addition to Ruttkay, Soudani would, from time to time, have other women stay temporarily at the residence and had sexual relations with those women.

56.    Ruttkay lived in the 40 Bailey Road residence for over a decade and married Soudani in 2010. Plaintiff believes that Soudani married Ruttkay, who had a worsening heart condition and was receiving a pension from the New York City education system, in order to obtain her pension and Social Security benefits. Soudani took out a life insurance policy on Ruttkay and, after she passed away in October 2012, collected on the policy and continued to receive her pension and Social Security benefits.

57.    Plaintiff believes Soudani poisoned Ruttkay, causing her death. She did not report her suspicions to the police because she thought that no one would believe her, that making a report would result in retribution by Soudani against her son, and that making a report would result in Soudani escalating even further the physical and sexual violence against her.

11

58.    Throughout the period, from 1985 to in or about October 2022, and including the period that Soudani was married to Ruttkay, Soudani continued to demand sexual intercourse and other sexual acts from Plaintiff. None of Soudani's sexual acts against Plaintiff were consensual.

59.    At various times during the Relevant Period, Plaintiff observed Soudani in possession of large quantities of what she believed to be date rape drugs.

60.    On multiple occasions, Soudani dosed Plaintiff with drugs and raped her. When this occurred, she did not remember being raped during the night before, but when she awoke, she felt pain and observed blood in her vaginal region, consistent with the consequences of being raped by Soudani on other occasions.

61.    Plaintiff feared for her life during this period. She felt the threat of immediate death or serious physical harm before, during, and after each instance of the sexual abuse.

62.    Plaintiff's fear was magnified by her belief that Soudani had killed two women and would not hesitate to kill her if she did not obey him and if doing so would suit his interests.

63.    In or about 1992, Soudani took an axe and destroyed the furniture in Plaintiff's bedroom, including the door, because he was angry with Plaintiff, causing Plaintiff to suffer fear of immediate death or physical harm, and causing her emotional anguish. The room remained without a door or bed for almost two years; Plaintiff used a sheet as a door and slept on a mattress on the floor.

64.    Soudani used threats of physical violence to socially isolate Plaintiff. If she socialized with other women, he called her a "whore" and other pejoratives and subjected her to physical abuse. He required Plaintiff to sit apart from other parents at school events, including but not limited to sporting events. Plaintiff was generally not allowed to leave the house to go

shopping by herself. When Plaintiff did leave the house, Soudani timed her absences and regularly quizzed her or other household members about whether Plaintiff had spoken to anyone while out, and if she had otherwise "behaved herself."

65.     Soudani's efforts to control Plaintiff created a constant sense of isolation, fear of retribution, and a barrier to Plaintiff seeking help or reporting the abuse. Making a report would result in an investigation and, regardless of its outcome, the threat of a violent rection by Soudani would require Plaintiff to leave the residence out of fear of retaliation; at the time, prior to October 2022, Plaintiff had nowhere else to go.

66.     Soudani's sexual assault and battery and other acts of physical violence against Plaintiff have caused her, and continue to cause her, significant emotional and psychological distress and harm.

### ii.     Plaintiff Fears for the Children's Safety

67.     During the Relevant Period, when Soudani's own children were minors and her own son was a minor, Plaintiff witnessed Soudani's physical abuse of his sons and feared that refusal of Soudani's sexual demands would exacerbate Soudani's abuse of the children.

68.     During the Relevant Period, after her own son had reached the age of majority and lived at the 40 Bailey Road residence, Plaintiff saw Soudani physically assault her son on a regular basis with his hands and with physical objects.

69.     During the Relevant Period, when Soudani's own children were minors, Plaintiff saw Soudani tie up his own children by the feet and hands as a punishment on multiple occasions.

70.     On one occasion during the Relevant Period, when Soudani's own children were minors, and Plaintiff's son was a minor, Soudani hit one of his sons with an axe, breaking the skin and causing a scar on his son's arm.

71.     During the Relevant Period, when Soudani's own children were minors and her own son was a minor, Plaintiff observed Soudani subject all members of the household to intense verbal abuse and threatened physical violence on a regular and continuous basis, causing the entire household to live in fear.

72.     Plaintiff's observation of the abuse, and the resulting knowledge that any challenge by her to his authority might result in Soudani's abusive retaliation against the children, constrained Plaintiff's ability to seek safety, report the abuse, or remove the children from Soudani.

73.     Plaintiff observed Soudani threaten to kill her son on multiple occasions.

74.     Prior to Plaintiff's escape in October 2022, Soudani's threats to her son's safety escalated. Plaintiff knew that, years earlier, Soudani had taken out a life insurance policy on her son's life. Now, Soudani suggested to Plaintiff in substance that it would be "easier" if Plaintiff's son was dead and suggested that Plaintiff kill her own son. Plaintiff was horrified and feared that Soudani planned to kill her son if he could not convince Plaintiff to do so. This fear was exacerbated because she knew that Soudani had received life insurance payments following the deaths of his wives, Helen and Elizabeth, and Plaintiff believed that Soudani had killed them both. Plaintiff's increasing fear that Soudani intended to kill her son contributed materially to Plaintiff's decision to leave Soudani's house in October 2022.

        **iii.     Soudani Asserts Financial Control over Plaintiff, Requires Plaintiff to Work for Him in His Businesses, and Otherwise Enriches Himself at Her Expense**

75.     Soudani economically subjugated and humiliated Plaintiff during the Relevant Period. He did not allow her to work outside the 40 Bailey Road residence other than as he himself ordered.

76.     In 2002, an irrevocable trust was entered into by Soudani and Ruttkay. After the trust was created, Soudani arranged for his financial accounts and his assets to be titled in the name of the trust.

77.     Soudani used his complete control of Plaintiff's economic circumstances to arrange for certain assets, including real estate, to be held in Plaintiff's name, making it appear that Plaintiff, and not Soudani, was the true owner of the asset. Plaintiff believed that Soudani did so to evade paying taxes. Plaintiff never enjoyed the use of the assets held in her name and received no compensation in return for the transfer of the assets to the trust. Eventually, the assets that Soudani arranged to be held in Plaintiff's name, including the real estate, were transferred to the trust.

78.     In 2017, Soudani caused documents to be created under which he would be both the trustee and beneficiary of the assets placed into the 2002 trust. This purportedly allowed him to take the assets from the 2002 trust, divert them to himself, and then remove them from the trust altogether.

79.     Throughout the Relevant Period, Soudani claimed that all funds that came into the house were "family money." In reality, Soudani controlled all of the finances.

80.     During the Relevant Period, prior to in or about 2009, Soudani required Plaintiff to work at various business establishments he owned or controlled, including a restaurant and a gas station mini mart.

81.     Soudani deprived Plaintiff of wage income from working in the restaurant and mini mart, wrongfully took Plaintiff's money as his own, and asserted control over her finances during the Relevant Period, ensuring that Plaintiff would continue to rely on him and never be financially independent.

15

82.     Throughout the Relevant Period, a constant and pervasive fear of retaliation—physical and sexual violence directed not only at Plaintiff, but at the children—prevented Plaintiff from asserting control over her own finances and demanding the return of her money and property from Soudani, much less challenging his actions in a court of law.

### iv. Soudani Takes Plaintiff's Child Support Payments

83.     In 1986, after Plaintiff and Elkarim divorced, Plaintiff received child support payments pursuant to the divorce settlement. However, Soudani directed all of the child support payments to a bank account under his sole control. Soudani told Plaintiff that the account contained "family money," and that he would make the decisions on how the money would be spent.

### v. Soudani Uses Plaintiff as a Nominee in Real Estate Transactions

84.     In the 1990s, Soudani required Plaintiff to hold various real estate properties in her name, including:

> a.     On or about July 1994, Soudani caused a durable General Power of Attorney to be executed stating that Plaintiff appointed Soudani as her attorney-in-fact (the "July 1994 PoA"), which was filed in the Orange County Clerk's Office.
>
> b.     On or about October 26, 1994, Soudani, acting as attorney-in-fact for Plaintiff, caused real estate that had been titled in Plaintiff's name to be sold to a third party. Plaintiff, who did not receive any proceeds resulting from the property sale and had not enjoyed the use of the property while it was held in her name, believes that Soudani pocketed the proceeds of the sale.

c.  Soudani also caused Plaintiff to sign a document evidencing the issuance of an $85,000 mortgage to the property buyer. Plaintiff provided the mortgagee no funds and never received any repayment from the mortgagee. Four years later—on or about June 18, 1998—Soudani required Plaintiff to execute documents that evidenced the assignment of the mortgage from Plaintiff to a trust controlled by Soudani. Plaintiff received no consideration for the transfer.

85.  On other occasions in the 1990s, Soudani caused real property to be transferred from himself or entities that Soudani controlled to Plaintiff and then, years later, back to himself.

86.  For example, on June 24, 1991, Soudani transferred three separate deeds of real property in the Town of Montgomery, Orange County, New York, to Plaintiff. Plaintiff, however, paid no funds to Soudani and did not possess the funds to pay Soudani. Then, on about June 18, 1998, Soudani caused Plaintiff to transfer two of the properties back to Soudani. Soudani paid no funds to Plaintiff. Documents evidencing the transfers are attached as Exhibit A. The third property was disposed of as described in paragraph 84(b), above.

### vi.  Soudani Diverts Plaintiff's Social Security Benefits to Himself and Requires Her to Work at his Businesses Without Pay

87.  In or around 2000, Soudani decided that Plaintiff should seek Social Security disability payments based on a claim that she had back pain that made it impossible for her to work. Plaintiff understood that Soudani had decided that the Social Security disability benefits would provide an added income stream to the household.

88.  Plaintiff visited doctors at Soudani's direction to obtain confirmation of a back condition, from which she in truth suffered, and her application for Social Security disability was approved. Plaintiff applied for disability benefits because Soudani directed her to do so.

89.    Soudani routed the Social Security benefit payments to a bank account over which he maintained exclusive control, again asserting that the funds were "family money." Plaintiff did not enjoy the use or benefit of the funds.

90.    Notwithstanding Plaintiff's back injury and the resulting payments of Social Security disability benefits, Soudani required Plaintiff to work, without pay, at business establishments that he owned or controlled, including a gas station mini mart that he operated. Plaintiff remained in pain during the time she worked; Soudani's disregard for her pain further caused Plaintiff to fear Soudani and further cemented his control of Plaintiff.

91.    Years later, in or about 2020, Soudani decided to use a different bank for banking and the new bank refused to accept Plaintiff's Social Security benefits because Plaintiff was not a signatory on the account. Only then did Soudani permit Plaintiff to open an account in her own name—but only for the purpose of receiving Social Security benefits.

### vii.    Soudani Requires Plaintiff to Handle Large Amounts of Cash

92.    Soudani required Plaintiff to handle large amounts of cash Soudani received and do with them and account for them as Soudani directed.

93.    During the Relevant Period, including within the last five years, Plaintiff observed Soudani accept checks from multiple individuals in return for cash. Plaintiff observed Soudani double-endorse the checks and deposit them in the "family" bank account Soudani controlled. Plaintiff understood that Soudani engaged in this activity to help the individuals to whom he provided cash evade taxes and child support payments.

94.    During the Relevant Period, including within the last five years, Plaintiff observed Soudani issue cash loans to individuals, including local political officials. Plaintiff saw Soudani put cash in the hands of multiple individuals, and Soudani required her to keep track of

the loan repayments. Plaintiff concluded based on her observation of this activity that Soudani was able to influence decisions made by local officials. These observations and the inferences she drew from them contributed to her conclusion that no one would believe her if she reported Soudani's abusive conduct to the authorities.

95.    In a written communication, accompanied by a photograph depicting a large sum of cash, Soudani bragged that he had more than $1 million in cash kept in safes within the 40 Bailey Road household. A copy of the photograph is attached as Exhibit B.

### viii.    Soudani Misappropriates Plaintiff's Money Resulting from a Car Accident Settlement

96.    In 2018, Plaintiff was involved in an automobile accident. Soudani caused Plaintiff to file a lawsuit in New York State Supreme Court, Orange County.

97.    In early 2021, Plaintiff was informed by her attorney that the lawsuit was settled for an amount favoring Plaintiff and that she would receive a check for the settlement. At the time, Plaintiff was out of the country, at Soudani's instruction, with family in Jordan. Soudani had permitted her to leave to deal with a legal matter relating to property in Jordan. Although Soudani had arranged for properties to be held in Jordan in Plaintiff's name, Plaintiff understood that Soudani, and not Plaintiff, was the only person who could decide how the properties would be disposed.

98.    Other than the brief time she was married, Plaintiff's trip to Jordan was the first time Soudani permitted Plaintiff to spend time apart from him. Soudani maintained constant virtual contact with Plaintiff during her time in Jordan. He questioned her repeatedly about whom she saw and with whom she spoke and required her to account for her time. Given her fear of Soudani, including the fear that Soudani would hurt her son while Soudani was too far away to allow her even the possibility of intervention, Plaintiff did everything she could to appease

Soudani's concerns and make him happy, including telling Soudani how much she missed him. Her fear, both for herself and her son, prevented her from telling her family in Jordan about the abuse and from staying in Jordan.

99.     In connection with the settlement of the car accident lawsuit, a check was issued in an amount exceeding $62,000 to Plaintiff (the "Settlement Proceeds"). Though the check was made out to Plaintiff, Soudani signed Plaintiff's name and his own name to the check. Soudani deposited the check into an account that he controlled, to which Plaintiff did not have access, on or about February 17, 2021.

100.    Soudani stated in substance that the Settlement Proceeds should be treated as "family money." As a result of decades of abuse, Plaintiff did not question his assertion, and accepted Soudani's insistence that Soudani had the right to control all money that entered the household, including but not limited to the Settlement Proceeds.

101.    In a letter dated June 6, 2023, Plaintiff has demanded the return of the Settlement Proceeds from Soudani; Soudani has ignored the demand.

### D.  October 2022: Plaintiff Escapes and Receives Extortionate Threats from Soudani

102.    Plaintiff and her son left the 40 Bailey Road residence in mid-October 2022 and drove to Colorado.

103.    Preceding their departure, the tension between Soudani and Plaintiff's son escalated, and on or about early October 2022 there was a violent interaction between Plaintiff's son and Soudani. For Plaintiff, the episode was the last straw. She believed that Soudani intended to kill her son, and that she had to take steps to remove herself and her son from Soudani's influence and abuse.

104.    Three or four days before Plaintiff left, Soudani, while drunk, forced Plaintiff to engage in sexual intercourse with him without her consent. The rape reinforced Plaintiff's decision to leave; Plaintiff was afraid that if she stayed that Soudani would kill her son.

105.    At some point after Plaintiff left New York for Colorado, Soudani accused Plaintiff of stealing money from him. Soudani made a complaint to local law enforcement authorities that Plaintiff stole more than $300,000 in cash when she left New York for Colorado. Plaintiff was charged in a felony complaint with Grand Larceny in the Second Degree, in violation of Penal Law § 155.40, filed March 8, 2023.

106.    After Plaintiff was charged, Soudani claimed to have the ability to exert influence over local authorities, including law enforcement authorities. Plaintiff believed, as a result of her previous observation of Soudani's interactions with local officials over time, including his extension of cash loans to local political officials and his hosting of multiple parties attended by local law enforcement at his restaurant, that Soudani could make good on his threats.

107.    Plaintiff agreed to return from Colorado to appear in court.

108.    On or about September 18, 2023, the Orange County District Attorney's Office ("OCDA") moved to reduce the felony court complaint to a misdemeanor charge. The motion was granted and, subsequently, the matter was dismissed by the Town of Goshen criminal court.

109.    Soudani also reported to the OCDA that Plaintiff's son stole money from Soudani that Soudani had provided Plaintiff's son to invest in cryptocurrency. Plaintiff's son was charged in an indictment with Grand Larceny in the First Degree, New York Penal Law § 155.42, and other charges. That matter is pending in New York State Supreme Court, Orange County.

110.    After Plaintiff and her son were arrested, Soudani issued extortionate threats designed to keep Plaintiff from communicating to law enforcement information about his long history of horrific abuse.

111.    Soudani's threats were ineffective. After Plaintiff's arrest, Plaintiff informed the OCDA about Soudani's long history of abuse.

112.    Thereafter, Soudani wrote a letter addressed to his son in Colorado which made clear that he knew that Plaintiff had made the report and demanded that his son give Plaintiff some "fucking advice." The son had been one of the children subjected to physical and sexual abuse by Soudani and had, years earlier, left New York to escape Soudani.  The entire letter is attached hereto as Exhibit C and includes the following:

> Now, as for [Plaintiff], all she has to do is give me $150,000 cash, give me back the car, and give me Rascal [a dog]. I would then be done with both of them forever, I wish her no harm and would be content with never seeing either one of them ever again. As you see the case is very very simple. It would be as if nothing ever happened. Now let me explain to you some facts about this case, please pay attention closely. **The more she fights me and opens her big mouth, the more I will be punishing her son like you have never seen before.**

> NOW – this case is very unique, let me tell you why. Usually the police make the arrest and bring the charges and the prosecutor would follow through with the charges. This case is different, the DA started the investigation, will make the charges and will prosecute the case.  From what I know, he has never lost a case in his career. Also you should know, the bus stops here at the DA's office. Nothing will happen unless he wants it to happen**. So far, all the bad mouthing from [Plaintiff] and [her son] has reached me. I know every word they said and trust me it doesn't mean shit. It is all hearsay.** It does not explain the crimes they have committed (emphasis added).

113.    In another letter, sent by Soudani to this son, but addressed directly to Plaintiff, Soudani states: "[y]ou don't understand how far my reach is" and "[y]ou are a delusional maget [sic] piece of shit that can only think of themselves as being the victim. I can make you lose your SSI and food stamps." The entire letter is attached hereto as Exhibit D.

22

114.    In the same letter, Soudani wrote:

For your information, I am in the best shape of my life. I am down to 170 pounds. The house is peaceful and spotless. Everybody I meet loves me. They say you can not find a nicer guy anywhere else. I have not screamed, lost my temper or even talked loud in the last five months because you are not here.

115.    Subsequently, in a text message sent to his son but addressed to Plaintiff, Soudani wrote (all typographical errors retained from the original):

You and your son a psychopath playing the victim. I'm the one who kept you guys floatin and covert all your mistakes. You are not smart you are a fucking idiot your son smart with somethings petty. Also a fucking dumb idiot you know different from your sisters you're worse than all of them Mrs. Ivana Trump **swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before** look how much destruction and pain and misery you're causing everyone around you as I said you want him all the jinx, the misery, factory and whatever you guys go will be destruction I know when you get mad at me, and turn against me dad wars when I arrested your son where you were in Jordan I'm gonna fix you you told Doug to call the cops he does not slow down when the cops came. **In your anger again you're fucking psychotic whack job you want to Denver and you have arested you're a fucking hypocrite, liar hypocrite, vicious mean sneaky fuck I swear to God, the more you fuck with me, the more I will destroy your son completely I fucking hate you** (emphasis added).

116.    The messages from Soudani caused Plaintiff severe anxiety and emotional distress, put her in fear for her physical safety, and caused her to fear for the physical safety of her son. Based on her past experience with Soudani, the threat caused Plaintiff to fear for her life and for the life of her son.

117.    By a letter dated April 26, 2023 (the "April 26, 2023 Letter"), Plaintiff formally revoked, pursuant to New York General Obligations Law ("GOL") § 5-1511(c), any and all powers of attorney claimed by Soudani, including but not limited to the July 1994 PoA. A copy of the communication is appended as Exhibit E.

118.    The April 26, 2023 Letter demanded, pursuant to GOL § 5-1505(2)(a)(3), that Soudani provide, within 15 days, a "record of all receipts, disbursements, and transactions" that

he conducted on behalf of Plaintiff, including but not limited to any life insurance policies taken out on Plaintiff.

119.    The April 26, 2023 Letter was delivered to Respondent's address the next day, on April 27, 2023.

120.    By letter postmarked May 3, 2023 Soudani claimed that he did not "ever remember having a power of attorney with [Plaintiff]" and did not "recall signing her name to anything" (the "May 8, 2023 Letter"). A copy of the communication is appended as Exhibit F.

121.    In the May 8, 2023 Letter, Soudani further claimed that "I do not understand why I have received this letter regarding power of attorney as I have never signed anything on behalf of [Plaintiff]."

122.    Soudani did not provide an accounting.

123.    In the May 8, 2023 Letter, Soudani admitted that he bought certain properties in Plaintiff's name in the country of Jordan, and claimed that he was the real owner despite the fact that Plaintiff held title to the properties. The properties are now the subject of litigation in Jordan. Soudani states:

> All of [Plaintiff's] cases overseas are under false pretenses. She says she paid for the properties yet all of the money came from my bank account which he lawyer has on record [sic].

124.    Plaintiff believes that Soudani has over the years signed her name on various documents, including checks, bank documents, and tax forms, presumably based upon an asserted exercise of a power of attorney to act and sign on behalf of Plaintiff.

125.    Plaintiff is not aware of all the times that Soudani has signed documents with her name to effectuate transfers of property or to conduct other business in her name.

126.    Plaintiff has filed an action for a special proceeding in New York State, Supreme Court, Orange County, seeking an order formally revoking any and all powers of attorney issued in favor of Soudani, and requiring Soudani to provide an accounting.

127.    Notably, Soudani's May 8, 2023 Letter also contains an extortionate threat:

Everything could disappear if they come out clean. I also want you to know, the more hard times are extended and [Plaintiff] lies about me, the more I will hurt her son for her.

128.    By letter dated June 6, 2023, received by Soudani on June 7, 2023, Plaintiff demanded the return of the Settlement Proceeds. The demand letter required the return of the funds within five business days of its receipt. Plaintiff further requested that Soudani have an attorney contact Plaintiff's attorney about the demand.

129.    Soudani responded to the letter on June 15, 2023. The letter contained various threats, including a warning that he intends to "punish" Plaintiff. He also referred to her as a "f---ing c—t." A copy of the communication is appended as Exhibit G.

130.    On or about June 19, 2023, Soudani communicated with an attorney in Jordan and instructed him to transfer title of an apartment held in Plaintiff's name to another party, asserting that since he paid for the apartment, he had the right to transfer ownership of the property even though it was held in Plaintiff's name. Soudani did not have Plaintiff's permission or authority to transfer title to the apartment.

131.    Plaintiff believes that Soudani, knowing that Plaintiff possesses information relating to criminal transactions, intends via the above-described written communications directed to her after October 2022 to compel her to refrain from communicating such information to law enforcement by instilling in her a fear that he will cause her, her son, and others serious

physical injury, and Soudani's written communications in fact did cause and continue to cause Plaintiff a fear that Soudani will cause Plaintiff, her son, and others serious physical injury.

### E. Plaintiff Never Consented to Sexual Contact with Soudani

132.    During each of the sexual assaults, Soudani acted with intent to compel Plaintiff's submission.

133.    During each of the sexual assaults, Plaintiff did not consent freely to engaging in sexual acts with Soudani.

134.    During each of the sexual assaults, Soudani sexually abused Plaintiff for the purpose of gratifying his sexual desires.

135.    Before and after he sexually abused her, Soudani threatened Plaintiff by telling her not to tell anyone about the abuse.

136.    Soudani also intimidated, coerced, and threatened Plaintiff by telling her no one would believe her if she told anyone about the abuse.

137.    Soudani also intimidated, coerced, and threatened Plaintiff by telling her that if she did not comply with his sexual demands, he would inflict harm on his children and her child.

138.    Soudani also subjected Soudani to physical abuse on a regular basis.

139.    Soudani struck Plaintiff with his hands and hard objects about the arms and back, causing her to suffer physical injuries and pain. He strategically took care not to hit Plaintiff about the face, so as not to leave an uncoverable physical mark.

140.    Soudani generally did not allow Plaintiff to seek medical attention for injuries that he caused her to suffer.

141.    When, in rare situations, Plaintiff was allowed to go to a doctor, Soudani forbade her to reveal that she was the victim of physical abuse upon threat of further physical abuse both to her and to others, including her son.

**FIRST COUNT**
**Battery (Sexual Abuse)**

142.    Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

143.    During the period from on or about October 1, 1978 to on or about October 14, 2022, Soudani committed battery through his sexually assaulting Plaintiff when she was an adult. Soudani repeatedly and intentionally touched Plaintiff in an offensive and sexual manner.

144.     Plaintiff did not consent to engaging in sexual acts with Soudani, who carried out the sexual attacks with undue influence, overt threats, duress, coercion, physical force, and intimidation.

145.    Soudani's actions constitute sexual offenses as defined in New York Penal Law Article 130, including but not limited to sexual misconduct as defined in Article 130.20, rape in the third degree as defined in Article 130.25, rape in the first degree as defined in Article 130.35, forcible touching as defined in Article 130.52, sexual abuse in the third degree as defined in Article 130.55, sexual abuse in the first degree as defined in Article 130.65, and incest as defined in Article 255. *See* N.Y. C.P.L.R. § 214-jg.

146.    As a direct and proximate result of Soudani's criminal acts, Plaintiff has in the past and will in the future continue to suffer substantial damages, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

**SECOND COUNT**
**Battery (Physical Abuse)**

147.    Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

148.    During the period from on or about October 1, 1978 to on or about October 14, 2022, Soudani committed battery by physically assaulting and abusing Plaintiff, intentionally striking and beating Plaintiff, and touching Plaintiff in an offensive and abusive manner.

149.    Plaintiff did not consent to this bodily contact with Soudani which was part of the power and control exercised over Plaintiff as a result of his persistent and repeated sexual abuse.

150.    As a direct and proximate result of Soudani's criminal acts, Plaintiff has in the past and will in the future continue to suffer substantial damages, including extreme emotional distress, humiliation, fear, psychological trauma, and loss of dignity and self-esteem.

**THIRD COUNT**
**Conversion**

151.    Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

152.    In connection with the settlement of Plaintiff's car accident lawsuit, a check was made out to Plaintiff, who had a possessory right to the Settlement Proceeds.

153.    On or about February 17, 2021, Soudani endorsed the check made out to Plaintiff and deposited her funds in his account, over which Plaintiff had no control. In doing so, he exercised an unauthorized dominion over the Settlement Proceeds, to the exclusion of Plaintiff's rights.

154.    In a letter dated June 6, 2023, Plaintiff demanded the return of the Settlement Proceeds. Soudani refused the demand on June 15, 2023.

155. Plaintiff has suffered damages resulting from the conversion of the Settlement Proceeds in an amount exceeding the amount of the Settlement Proceeds to be determined at trial.

**FOURTH COUNT**
**Money Had and Received**

156. Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

157. By virtue of the control and power he held over Plaintiff, including the power and control obtained as a result of his persistent and repeated sexual abuse, Soudani obtained money, including but not limited to the Settlement Proceeds, from Plaintiff.

158. Soudani stated that the money, including but not limited to the Settlement Proceeds, was "family money." Following years of abuse, Plaintiff did not question Soudani's assertion, and a constant and pervasive fear of retaliation—physical and sexual violence directed at her and the children—prevented her from seeking the return of her funds either directly from Soudani or in a court of law.

159. On information and belief, Soudani used the Settlement Proceeds for his own personal purposes, and not for the benefit of Plaintiff.

160. Equity and good conscience require that Soudani return the money, including but not limited to the Settlement Proceeds, to Plaintiff.

161. Accordingly, Plaintiff is entitled to disgorgement of the money, including but not limited to the Settlement Proceeds, with interest and costs.

## ~~FIFTH COUNT~~
## Unjust Enrichment

~~162.~~151.    Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

~~163.~~152.    During the period from on or about November 9, 2017 to on or about October 14, 2022, a~~A~~sserting power and control, including the power and control obtained as a result of his persistent and repeated sexual abuse over Plaintiff, Soudani obtained money, including but not limited to the Settlement Proceeds, from Plaintiff.

~~164.~~153.    Soudani stated that the money, including but not limited to the Settlement Proceeds, was "family money." Following years of abuse, Plaintiff did not question Soudani's assertion, and a constant and pervasive fear of retaliation—physical and sexual violence directed at her and the children—prevented her from seeking the return of her funds either directly from Soudani or in a court of law.

~~165.~~154.    By way of obtaining the money, including but not limited to the Settlement Proceeds, Soudani was unjustly enriched.

~~166.~~155.    Accordingly, Plaintiff is entitled to damages for unjust enrichment.

## ~~SIXTH~~ FOURTH COUNT
## Intentional Infliction of Emotional Distress

~~167.~~156.    Plaintiff incorporates by reference the allegations stated above as if fully set forth herein.

~~168.~~157.    During the period from in or about August 1977 to on or about October 14, 2022, and a~~A~~s a direct result of these allegations as stated, Soudani committed intentional infliction of emotional distress against Plaintiff.

169.158.        For years, Soudani, through a pattern of gross, extreme, outrageous, and malicious conduct that shocks the conscience and goes beyond all possible bounds of decency, raped, assaulted, battered, molested, harassed, degraded, and retaliated against Plaintiff, his sister, and caused her to witness the abuse of other victims—Soudani's sons and Plaintiff's son. Soudani's incestuous and abusive acts towards Plaintiff go beyond all possible bounds of decency and are intolerable in a civilized community.

170.159.        Soudani knew that his atrocious and outrageous conduct would—and indeed, did—keep Plaintiff in a persistent state of fear and humiliation, and would cause her severe emotional distress.

171.160.        As a direct and proximate result of Soudani's acts, Plaintiff has incurred physical and psychological trauma and damage, and has in the past and will in the future continue to suffer substantial damages, including extreme emotional distress, humiliation, fear, psychological trauma, and loss of dignity and self-esteem.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Soudani, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper. Plaintiff prays for judgment on all of the preceding Counts as follows:

    a.  Awarding Plaintiff compensatory damages for her injuries, in an amount in excess of $75,000, to be determined at trial;

    b.  Awarding Plaintiff punitive damages for her injuries, in an amount in excess of $75,000, to be determined at trial;

    c.  Awarding Plaintiff prejudgment interest, to the extent available by law; and

    d.  Awarding such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

DATED: ~~November 9, 2023~~February
         __, 2024                              Respectfully submitted,
New York, New York


                                              LEWIS BAACH KAUFMANN
                                              MIDDLEMISS PLLC


                                              By: _____
                                              Arthur D. Middlemiss
                                              arthur.middlemiss@lbkmlaw.com
                                              Marc F. Scholl
                                              marc.scholl@lbkmlaw.com
                                              The Chrysler Building
                                              405 Lexington Avenue, 64th Floor
                                              New York, NY 10174
                                              Telephone: (212) 826-7001
                                              Facsimile: (212) 826-7146

**VERIFICATION**

STATE OF COLORADO                                    )

                                                                          ) ss.:

COUNTY OF ~~ARAPAHOE~~DOUGLAS                    )


Eman Soudani, being duly sworn, deposes and says that I am the plaintiff in the case captioned

*Eman Soudani v. Mout'z Soudani* in the United States District Court for the Southern District of

New York and have authorized the filing of this Amended Ceomplaint. I have reviewed the

allegations made in the Amended Ceomplaint, and to those allegations of which I have personal

knowledge, I believe them to be true. As to those allegations of which I do not have personal

knowledge, I rely on information provided to me by my family members and I believe them to be

true.


                                                    _____

                                                    EMAN SOUDANI


Sworn to me this ___ day of _____, 20__.


_____

Notary Public