**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EMAN SOUDANI,

Plaintiff and Counterclaim-Defendant,

-against-

MOUT'Z SOUDANI,

Defendant and Counterclaim-Plaintiff.

Case No.: 23-cv-9905 (PMH) (AEK)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT MOUT'Z SOUDANI'S MOTION TO DISMISS**

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC

Arthur D. Middlemiss
Arthur.Middlemiss@lbkmlaw.com
Marc Scholl
Marc.Scholl@lbkmlaw.com
10 Grand Central
155 East 44th Street, 25th Floor
New York, NY 10017
Telephone: (212) 826-7001
Facsimile: (212) 826-7146

*Counsel for Plaintiff and Counterclaim-*
*Defendant Eman Soudani*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 3

ARGUMENT ....................................................................................................................... 4

    I.   NEW YORK REVIVED ALL TORTS THAT ARISE OUT OF CONDUCT THAT
    WOULD BE A SEXUAL OFFENSE. THEREFORE, PLAINTIFF'S BATTERY,
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND UNJUST
    ENRICHMENT CLAIMS WERE TIMELY BROUGHT (Responding to Defendant's Points I
    through III) ..................................................................................................................... 4

    II.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM FOR UNJUST
    ENRICHMENT (Responding to Defendant's Point III) ...................................................... 10

    III.  THERE ARE NO "SCANDALOUS" ALLEGATIONS THAT SHOULD BE STRICKEN
    FROM THE AMENDED COMPLAINT (Responding to Defendant's Point IV) .................. 12

        A.   Allegations Referencing Murder ............................................................................ 14

        B.   Allegations Referencing Abuse ............................................................................. 17

        C.   Other Allegations ................................................................................................. 19

            a.   Paragraph 32 .................................................................................................. 19

            b.   Paragraph 109 ................................................................................................ 20

CONCLUSION .................................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson Marszal v. Anderson*,
  9 A.D.3d 711 (3d Dep't 2004) ................................................................................................12

*Choudhari v. Choudhari*,
  220 A.D.3d 835 (2d Dep't. 2023) ...........................................................................................12

*Coe v. Poly Prep Country Day Sch.*,
  No. 504095/2020, 2023 WL 3738423 (Sup. Ct. Kings Cnty. May 19, 2023) ..........................6

*Doe v. N.Y.C. Dep't of Educ.*,
  No. 1:21-cv-04332, 2024 WL 149289 (E.D.N.Y. Jan. 12, 2024) ............................................6

*Doe v. New York City Bd. of Educ.*,
  669 F.Supp.3d 160 (E.D.N.Y. 2023) .......................................................................................5

*Doe v. Pro Camps, Ltd.*,
  No. 528018/2019, 2023 WL 3778565 (Sup. Ct. Kings Cnty. May 22, 2023) ..........................6

*Doe v. Wilhelmina Models, Inc.*,
  No. 950242/2019, 2022 N.Y. Misc. LEXIS 10374 (Sup. Ct. N.Y. Cnty. Oct. 6,
  2022) .........................................................................................................................................8

*Doe v. Wilhelmina Models, Inc.*,
  226 A.D.3d 30 (1st Dep't 2024) ..............................................................................................9

*Eshelby v. L'Oréal USA, Inc.*,
  664 F.Supp.3d 417 (S.D.N.Y. 2023)......................................................................................11

*In re Estate of Ferrara*,
  7 N.Y.3d 244 (2006) ..............................................................................................................12

*Goldberg v. Meyers*,
  181 A.D.3d 653 (2020) ..........................................................................................................12

*Greene v. WCI Holdings Corp.*,
  956 F. Supp. 509 (S.D.N.Y. 1997) ........................................................................................11

*Hayes v. Archdiocese of New York*,
  No. 951241/2021, 2022 WL 4316486 (Sup. Ct. N.Y. Cnty. 2022) ........................................10

*J.S.M. v. City of Albany Dep't of Gen. Servs.*,
  No. 907624-23, 2024 WL 1846567 (Sup. Ct. N.Y. Cnty. Jan. 25, 2024)................................5

*Joyner v. Alston & Bird LLP*,
 No. 21-CV-8549(AT)(SLC), 2022 WL 913061 (S.D.N.Y. 2022).........................................11

*Mantella v. Mantella*,
 268 AD2d 852 (3d Dep't 2000) ..............................................................................................12

*Moraes v. White*,
 571 F.Supp.3d 77 (S.D.N.Y. 2021) ........................................................................................11

*Perez v. Archdiocese of N.Y.*,
 No. 950236/2019, 2021 WL 4895306 (Sup. Ct. N.Y. Cnty. Oct. 19, 2021) ..........................10

*Rapp v. Fowler*,
 No. 20-CV-9586 (LAK), 2022 WL 1997176 (S.D.N.Y. June 6, 2022) .............................. 9-10

*Roe v. Poly Prep Country Day Sch.*,
 No. 527551/2019, 2023 WL 2265718 (Sup. Ct. Kings Cnty. Feb. 28, 2023) ..........................6

*Segal v. New York Mil. Acad.*,
 No. 21-CV-6872(VB), 2023 WL 5211220 (S.D.N.Y. Aug 14, 2023)................................... 5-6

*Shapiro v. Syracuse University*,
 208 A.D.3d 958 (4th Dep't 2022)......................................................................................... 6-7

*Sivan v. Mizrahi*,
 No. 111150/2009, 2015 WL 4501188 (Sup. Ct. N.Y. Cnty. July 22, 2015) ......................... 7-8

*Smith v. Pro Camps Ltd.*,
 No. 2023–05131, 2024 WL 1645089 (2d Dep't Apr. 17, 2024) ...............................................5

*Ulla-Maija, Inc. v. Kivimaki*,
 No. 02-CV-3640(AGS), 2003 WL 169777 (S.D.N.Y. Jan. 23, 2003)....................................13

*Wilkie v. Vill. of Hempstead*,
 No. 22-CV-00920(JMA)(JMW), 2023 WL 5952056 (E.D.N.Y. June 20, 2023)........... 6, 8-10

**Statutes**

Adult Survivors Act, N.Y. C.P.L.R. § 214-j ......................................................................... *passim*

Child Victims Act, N.Y. C.P.L.R. § 214-g ............................................................................ *passim*

N.Y. Gen. Oblig. Law § 5-1502M(1) (1996).............................................................................11

N.Y. Gen. Oblig. Law § 5-1505...............................................................................................12

N.Y. York Penal Law Article 130 ......................................................................................... 6-8

N.Y. York Penal Law Article 255 ......................................................................................... 7-8

**Other Authorities**

1996 Sess. Law News of N.Y. Ch. 499 (S. 4757–A) (McKINNEY'S) .........................................11

Federal Rules of Civil Procedure 12(b)(6).........................................................................................11

Federal Rules of Civil Procedure Rule 12(f) ........................................................................ 12-13

Plaintiff and Counterclaim-Defendant Eman Soudani ("Plaintiff" or "Ms. Soudani") submits this Memorandum of Law in opposition to Defendant and Counterclaim-Plaintiff Mout'z Soudani ("Defendant")'s Motion to Dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

Ms. Soudani alleges over 45 years of horrific sexual abuse by Defendant, her brother. In 1977, when she was 17, Defendant brought Ms. Soudani to the U.S. Within a month of her arrival, Defendant's wife was murdered, and Defendant forced Ms. Soudani to supply a false alibi for his whereabouts the night of its occurrence. Thereafter, she dropped out of school to care for his three children. Within months, he took her virginity. Afterwards, Defendant employed physical abuse, social isolation, and economic deprivation as tools to keep Ms. Soudani under his control and to ensure his continued ability to subject her to sexual abuse. No less than if Defendant tied her up and locked her in a room, Defendant use of these tools facilitated his sexually abuse of Ms. Soudani.

The Amended Complaint ("Am. Compl."), ECF No. 31, details Defendant's abuse of Ms. Soudani, and alleges four causes of action: (i) Battery (sexual abuse); (ii) Battery (physical abuse); (iii) Unjust Enrichment; and (iv) Intentional Infliction of Emotional Distress ("IIED").

As a preliminary matter, Defendant does not seek to dismiss Plaintiff's first cause of action for Battery (sexual abuse). Nor can he: the Amended Complaint more than sufficiently makes out the claim based on the decades of sexual abuse that Ms. Soudani endured, and Defendant cannot dispute that the claim is properly revived under the New York Adult Survivors Act ("ASA"). N.Y. C.P.L.R. § 214-j.

Defendant, in his Memorandum of Law in support of his Motion to Dismiss ("MOL"), seeks to dismiss three counts – Battery (physical abuse), Unjust Enrichment, and IIED – on the

grounds that these claims cannot be revived under the ASA. Defendant also argues that, if the IIED claim is not revived, it should be dismissed because the alleged conduct that occurred during what he believes is the applicable statute of limitations does not demonstrate the required level of outrageousness. He further argues that the Unjust Enrichment claim should be dismissed because Plaintiff purportedly waived "any personal authority over fund management" by allegedly executing a power of attorney. MOL at 7-8. Finally, Defendant argues that various "scandalous" allegations in the Amended Complaint, including those relating to Defendant's murder of his two former wives, physical assault of Plaintiff and the children, and sexual assault of the children, should be stricken from the Amended Complaint.

None of these arguments withstands scrutiny. New York state and federal courts have found routinely that the ASA revives any and all claims that "arise out of" conduct that constitutes a defined sexual offense, not just claims directly relating to sexual offenses. Defendant's physical abuse and financial domination of Plaintiff, in addition to his social isolation of Plaintiff, provided Defendant the means and continued opportunity for the repeated sexual abuse. The Amended Complaint alleges horrific abuse perpetrated by Defendant against Plaintiff over the course of decades that is more than sufficient to state a claim for IIED. As to Unjust Enrichment, Defendant's argument relies on a patently false premise – that a power of attorney, even if properly granted, provided him with the power to take Plaintiff's money for himself. New York law does not permit an attorney-in-fact to self-deal. Self-gifts by an attorney-in-fact to himself carry a "presumption of impropriety." And, finally, the allegations relating to Defendant's abuse of Plaintiff's son and Defendant's children, and Plaintiff's belief that Defendant killed two women are all relevant – Defendant provoked and then exploited Plaintiff's fears rising from this conduct to keep her in his

control, to prevent her from reporting the conduct and to ensure her continued submission to the sexual abuse.

## FACTUAL BACKGROUND

Ms. Soudani moved to the U.S. from Jordan in 1977 when she was just 17 years old. Her brother, Defendant, promised her an education and a better life in the United States. Am. Compl. ¶ 19. She moved into Defendant's house, where he was living with his wife at the time and three children, and began going to high school in Rockland County, New York. *Id.* ¶¶ 19, 21-22.

Within months of her arrival, Defendant's wife was brutally murdered. *Id.* ¶ 23. Defendant instructed Plaintiff to provide a false alibi for him to the police and threatened to beat her severely if she refused. *Id.* ¶ 24. Soon thereafter, Defendant sexually assaulted her, and eventually raped her in February 1978, taking her virginity. *Id.* ¶¶ 26-30.

This marked the beginning of over 45 years of horrific sexual abuse by Defendant. Defendant perpetrated this sexual abuse by beating Plaintiff into submission, threatening to beat Plaintiff, and drugging Plaintiff. *Id.* ¶¶ 31-66. Defendant controlled all aspects of Plaintiff's social life, including by isolating her from other parents and women, forbidding her from leaving the house, and constantly questioning her whereabouts. *Id.* ¶¶ 64-65. Defendant also exerted complete financial control over Plaintiff, forcing her to work for business he owned and depriving her of wages, forbidding her from working elsewhere, taking her social security benefits and other moneys for himself, and arranging for certain assets to be held in her name without allowing her to enjoy the use of those assets. *Id.* ¶¶ 75-101.

Defendant used physical abuse, financial domination, and social isolation as tools to facilitate his continued sexual abuse of Plaintiff, and to prevent her from reporting his abuse to the authorities or seeking a life outside of Defendant's home. For the same reasons, Defendant

subjected Plaintiff's son and Defendant's own children to persistent physical abuse, which further constrained Plaintiff's ability to seek safety, report the abuse, or remove the children from Defendant. *Id.* ¶¶ 67-74. He preyed on her shame, her dependence, and her belief that no one would believe her and that things would only get worse if she failed to comply.

Plaintiff finally escaped to Colorado with her son in mid-October 2022. After their escape, Defendant accused Plaintiff of stealing money from him, and Plaintiff was charged with Grand Larceny in the Second Degree, a charge which was ultimately dismissed. *Id.* ¶¶ 105-108. After Plaintiff informed the Orange County District Attorney's office about Defendant's long history of abuse, Defendant sent threatening and extortionate letters addressed to her and her son stating (*inter alia*) that "[t]he more she fights me and opens her big mouth, the more I will be punishing her son like you have never seen before" and "you deserve a fucking beating like you never had before." *Id.* ¶¶ 111-131.

## **ARGUMENT**

### I. **NEW YORK REVIVED ALL TORTS THAT ARISE OUT OF CONDUCT THAT WOULD BE A SEXUAL OFFENSE. THEREFORE, PLAINTIFF'S BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND UNJUST ENRICHMENT CLAIMS WERE TIMELY BROUGHT (Responding to Defendant's Points I through III)**

Defendant argues that the ASA did not revive Plaintiff's Battery (Physical Abuse), IIED, and Unjust Enrichment claims because they are not predicated on conduct that would constitute a sexual offense as defined under the ASA. MOL at 2-7. The argument misreads the statute and ignores myriad cases interpreting the ASA and Child Victims Act ("CVA").[11] Defendant's motion to dismiss, based upon his statute of limitations argument, should be denied.

---

[11] The CVA included provisions that revived the time within which survivors of child sexual abuse could file state civil suits related to their abuse. N.Y. C.P.L.R. § 214-g. The subsequently enacted revival provision of the ASA is substantially similar to that of the CVA. N.Y. C.P.L.R. § 214-j.

The ASA revives "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered **as a result of conduct** which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, or incest as defined in section 255.26 or 255.27 of the penal law ...." N.Y. C.P.L.R. § 214-j (emphasis added).

As the New York State Supreme Court, Appellate Division, Second Department recently held, and contrary to Defendant's argument otherwise, the CVA, upon which the ASA is modelled, "did not criminalize or penalize behavior that was previously lawful, nor did it create a new private right of action. Rather, the statute revived prior claims or causes of action that already existed but were barred either because of the expiration of the applicable statute of limitations or the plaintiff's failure to file a timely notice of claim." *Smith v. Pro Camps Ltd.,* No. 2023–05131, 2024 WL 1645089, at *2 (2d Dep't Apr. 17, 2024).

Likewise, the ASA, like the CVA, revives a "broader set of causes of action than the [sexual] assault itself, including negligent supervision and hostile work environment, provided the ultimate injury was the result of a sexual offense." *J.S.M. v. City of Albany Dep't of Gen. Servs.*, No. 907624-23, 2024 WL 1846567, at *5 (Sup. Ct. N.Y. Cnty. Jan. 25, 2024). Indeed, courts have found that the statutory reference to "negligent" means that "the ambit of the ASA was intended to be broader than merely allowing suits for the sexual offenses themselves." *Id.*; *Doe v. New York City Bd. of Educ.*, 669 F.Supp.3d 160, 165 (E.D.N.Y. 2023) ("[T]he plain language of the CVA embraces these civil claims" brought under the Human Rights Law, as it "revives 'every civil claim or cause of action,' language that definitively encompasses the NYSHRL ..."); *Segal v. New York Mil. Acad.*, No. 21-CV-6872(VB), 2023 WL 5211220, at *6 (S.D.N.Y. Aug 14, 2023)

(denying motion to dismiss state law discrimination claims on ground that they are not covered by the CVA); *see also Wilkie v. Vill. of Hempstead*, No. 22-CV-00920(JMA)(JMW), 2023 WL 5952056, at *7 (E.D.N.Y. June 20, 2023) (rejecting argument that "since the ASA only covers conduct that constitutes a sexual offense as defined in N.Y. Penal L. § 130, false imprisonment and false arrest, which are not such offenses, cannot be asserted under the ASA").

Courts have routinely revived claims for IIED, assault, battery, false imprisonment, and other claims not directly constituting a sexual offense under the ASA so long as those claims "ar[o]se out of conduct that constitutes a sexual offense" or involved an "injury or condition suffered as a result of conduct which would constitute" a sexual offense. *Wilkie*, 2023 WL 5952056, at *7; *Doe v. N.Y.C. Dep't of Educ.*, No. 1:21-cv-04332, 2024 WL 149289, at *1 n. 1 (E.D.N.Y. Jan. 12, 2024) ("[T]here is no question that the CVA revives sexual assault and statutory rape claims … or IIED claims premised on that conduct"); *Doe v. Pro Camps, Ltd.*, No. 528018/2019, 2023 WL 3778565 (Sup. Ct. Kings Cnty. May 22, 2023) (denying motion to dismiss claims of *inter alia* IIED, assault, and battery revived under the CVA); *Roe v. Poly Prep Country Day Sch.*, No. 527551/2019, 2023 WL 2265718 (Sup. Ct. Kings Cnty. Feb. 28, 2023) (same); *Coe v. Poly Prep Country Day Sch.*, No. 504095/2020, 2023 WL 3738423 (Sup. Ct. Kings Cnty. May 19, 2023) (same).

Defendant's claim mirrors the defendant's failed argument in *Shapiro v. Syracuse University*, 208 A.D.3d 958 (4th Dep't 2022). There, the plaintiff brought claims against a summer camp, Camp Greylock, Inc., that included causes of action for negligence, gross negligence, recklessness, and failure to exercise a reasonable standard of care as well as negligent hiring, negligent retention, negligent training, and negligent supervision. The trial court granted the defendant's motion for summary judgment on statute of limitations grounds. *Id.* at 958, 961. On

appeal, the Appellate Division reversed and found that the "CVA revival statute applies" to the dismissed causes of action. *Id.* at 962. The *Shapiro* Court noted that "it is undisputed that the claims against Greylock *arise from sexual abuse that occurred.*" *Id.* at 961.

The same is true here. Defendant subjected Plaintiff to over 45 years of horrific sexual abuse. Defendant's concomitant physical abuse, social isolation, and economic deprivation of Ms. Soudani cemented his dominion and control over her, and thus provided him with the means and opportunity to continue the sexual abuse. He preyed on Plaintiff's fear that he would kill her if she reported him, and that no one would believe her if she came forward. Thus, the Battery (physical abuse) and IIED arose from and were the result of the sexual abuse – they were the means Defendant used to imprison her in the house for the purpose of keeping her available for his sexual abuse. In the plain words of the statute, the injuries Plaintiff suffered resulting from that physical abuse and economic deprivation were "as a result of conduct" that violated crimes articulated in New York Penal Law Article 130 and incest as defined in New York Penal Law Article 255.

With respect to IIED, Defendant's sole argument is on statute of limitations grounds, i.e., that Plaintiff failed to allege sufficient facts alleging IIED within a one-year period preceding her filing of the Complaint (MOL at 3-6). He makes no attempt, nor can he, to argue that the Complaint fails to allege sufficiently IIED inflicted by him on Plaintiff during the period from August 1977 to October 2022. In other words, Defendant recognizes that if his revival argument fails, the alleged facts make out an IIED claim.[2]

---

[2] Plaintiff does not accept Defendant's characterization of extortionate threats made by him following her escape from his control in October 2022 as "litigation chatter." Defendant's post-October 2022 comments are material and relevant to Ms. Soudani's IIED claim. The tone and tenor of Defendant's communications were designed to put Plaintiff in emotional distress, and provide, in his own voice, insight into how he treated Plaintiff. The extortionate threats, including threats of bodily harm on Plaintiff ("[Y]ou deserve a fucking beating like you never had before" … "[T]he more you fuck with me, the more I will destroy your son completely I fucking hate you …") are more than sufficient to ground an IIED claim in and of themselves (Am. Compl., Ex. D). *Sivan v. Mizrahi*, No. 111150/2009, 2015 WL 4501188, at *4 (Sup. Ct. N.Y. Cnty. July 22, 2015) ("[C]ertainly, in this case, plaintiffs' allegations, which are

With respect to Defendant's claims about the revival of the Unjust Enrichment claim, Plaintiff amended the cause of action to avoid the issue altogether, and to limit the applicable time frame to six years prior to the filing of the Complaint, both to streamline the matter and to avoid motion practice as to the statute of limitations. She also sought to avoid complicated property valuation issues involving Defendant's sale of properties that he had caused to be held in her name some thirty years ago (*see* Am. Compl. ¶¶ 84-86). As currently constituted, the Unjust Enrichment cause of action involves the proceeds of a car accident settlement (approximately $62,000) that Defendant deposited into an account under his sole control (*id*. ¶¶ 96-101) and Plaintiff's Social Security and other benefits that Defendant caused to be deposited into such accounts that occurred during the alleged period (*id*. ¶¶ 87-91).[3]

The cases Defendant relies upon to support his various arguments are either inapposite or consistent with Plaintiff's position. For example, Defendant cites *Wilkie*, which categorically rejected Defendant's argument that the ASA only covers conduct that constitutes a sexual offense and allowed to stand claims for false imprisonment and false arrest, which are not based on N.Y. Penal Law Articles 130 and 255 crimes. *Wilkie*, 2023 WL 5952056, at *8. Notably, too, as discussed below, the *Wilkie* court forcefully distinguishes another case upon which Defendant relies.

Likewise, Defendant cites the trial court's decision in *Doe v. Wilhelmina Models, Inc.*, No. 950242/2019, 2022 N.Y. Misc. LEXIS 10374 (Sup. Ct. N.Y. Cnty. Oct. 6, 2022). Defendant ignores, however, that the First Department reversed the trial court's decision in February 2024,

---

supported by sworn affidavits that allege threats of bodily harm to the plaintiffs and their families, supply sufficient evidence of conduct that could conceivably inflict severe emotional distress on the plaintiffs.").

[3] To the extent Defendant argues that evidence about his economic isolation of Ms. Soudani throughout the period alleged in the Amended Complaint, including his use of Plaintiff as a nominee in real estate transactions and his wrongful taking of her benefits and wages is irrelevant, we disagree for the reasons stated herein, i.e., that economic deprivation was a tool that Defendant used to control Plaintiff, and to facilitate his sexual abuse of Plaintiff.

and found that "non-sexual" torts arising from the alleged sexual abuse, i.e., the negligence, breach of fiduciary duty and invasion of privacy claims brought by the plaintiff, were properly revived. *Doe v. Wilhelmina Models, Inc.*, 226 A.D.3d 30 (1st Dep't 2024) (affirming dismissal of other claims, including respondeat superior, because they were not adequately alleged, not because they were time-barred). Further, at the trial court level, certain claims of negligence and breach of fiduciary duty, invasion of privacy, and sexual harassment were dismissed not on revival grounds, but because the alleged conduct occurred in Mexico, not New York, and because the plaintiff failed to allege facts sufficient to meet the definition of "sexual conduct" prescribed by the CVA.

Defendant also cites, without explanation, to *Rapp v. Fowler*, No. 20-CV-9586 (LAK), 2022 WL 1997176, at *3 (S.D.N.Y. June 6, 2022), which found that an assault claim could not be revived under the CVA because "common law assault" was "not a sexual offense … defined in the Penal Law." *Wilkie*, however, cited above, in permitting false imprisonment and false arrest torts to proceed, distinguished *Rapp* and pointed out that New York authority and legislative history were contrary to *Rapp*:

> Defendants point to Rapp to support their interpretation of N.Y. C.P.L.R. 214-j, that a claim must involve conduct that itself is a sexual offense itself in order to be revived. *See Rapp v. Fowler*, No. 20-CV 9586 (LAK), 2022 WL 1997176 at *3 (S.D.N.Y. June 6, 2022). In *Rapp*, the court held that the CVA did not revive the plaintiff's common law assault claim. Id. The court noted that since common law assault "is not a sexual offense...as defined in the Penal Law, the Child Victims Act did not revive such claims." *Id.* The conclusion certainly supports Defendants' reading of the ASA. However, it is supported by little reasoning and appears at odds with the New York authority on point. Nonetheless, the Court finds the state intermediate appellate court's revival of a claim that is not a sexual offense under the CVA to be a more persuasive indicator of how the highest court in the state would interpret the ASA.
>
> Moreover, the legislative history of the ASA offers further support for Plaintiff's proffered interpretation of the statute. *See Trump*, 2023 WL 185507, at *7 (noting that courts may consider "such historical or other facts as are reasonably within the scope of judicial cognizance," *inter alia*, "statements by bill sponsors" when considering the intention of the state legislature). Senate Bill 66 eventually became

the ASA, and the legislative committee report accompanying the bill stated in relevant part that the ASA "would create a one-year window for the revival of otherwise time-barred civil claims *arising out of sexual offenses* committed against people who were 18 or older at the time of the conduct." *Id.* (citing N.Y. Comm. Rept., 2021 NY S.B. 66 (NS).

*Wilkie,* 2023 WL 5952056, at *8-9 (emphasis omitted). We note that, to our knowledge, not a single decision has relied upon or cited *Rapp.*

Defendant's reliance on *Perez v. Archdiocese of N.Y.*, No. 950236/2019, 2021 WL 4895306 (Sup. Ct. N.Y. Cnty. Oct. 19, 2021), decided a year earlier than *Rapp* and two years before *Wilkie*, can be distinguished for the same reasons. There, the trial court dismissed claims for physical and emotional abuse, finding that "general claims of physical and emotional abuse that are not sexual in nature, or within the confines of the elements set forth in the enumerated statutes, are not revived." On its face, the decision, like *Rapp*, would appear to disallow revival of "non-sexual" torts, such as IIED, failure to supervise an employee, breach of fiduciary duty, violations of the New York Human Rights Law, false imprisonment, or false arrest, in contradiction of the statutory language. We note that, again, to our knowledge, no other court has relied upon or cited *Perez* for the proposition Defendant asserts.[4]

## II. THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM FOR UNJUST ENRICHMENT (Responding to Defendant's Point III)

Defendant argues that, under powers of attorney supposedly executed "either in 1994 or 2004" he had "full and complete authority to manage all funds." According to Defendant, Plaintiff cannot recover money that she alleges Defendant stole because Defendant was permitted simply to take Plaintiff's money under the alleged power of attorney. As Defendant did routinely in life, the argument ignores the fiduciary role imposed on a power-of-attorney to act to the benefit of the

---

[4] A single trial court decision cites *Perez* for an unrelated point, *i.e.,* the proposition that the "recited statutes" in the CVA did not "permit a [standalone] private right of action." *Hayes v. Archdiocese of New York*, No. 951241/2021, 2022 WL 4316486 (Sup. Ct. N.Y. Cnty. 2022).

principal.

To be sure, the Amended Complaint alleges that, in 1994, Defendant caused a general durable power of attorney to be created that appointed Defendant as Plaintiff's attorney-in-fact and, thereafter, conducted certain real estate transactions in her name. Am. Compl. ¶ 84. That agreement[5] contains no provision authorizing Defendant simply to take or "self-gift" Plaintiff's money. *See* Declaration of Arthur D. Middlemiss, Ex. A, filed herewith. The Amended Complaint contains no reference to any power of attorney supposedly created in 2004. In any event, the Amended Complaint alleges further that Defendant, in his own words, did not "ever remember having a power of attorney with [Plaintiff] and did not recall signing her name to anything." *Id*. ¶¶ 120-21.[6] Now, in a reversal of his own written statement, Defendant takes the position that he took every act related to Ms. Soudani's money pursuant to a power of attorney.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court will "look[] only to the four corners of the Complaint and evaluate[] the legal viability of the allegations contained therein." *Joyner v. Alston & Bird LLP*, No. 21-CV-8549(AT)(SLC), 2022 WL 913061, at *2 (S.D.N.Y. 2022), *quoting Greene v. WCI Holdings Corp.,* 956 F. Supp. 509, 514 (S.D.N.Y. 1997). Here, Defendant baldly asserts a defense, i.e., that he took Plaintiff's money by authority of a power of attorney. The Court must disregard this new and unsworn claim for the simple reason that it is not alleged in the Amended Complaint. And, to the extent Defendant's describes a process

---

[5] A court may consider documents that are incorporated by reference in a complaint or otherwise integral to the complaint in reviewing a motion to dismiss. *See Moraes v. White*, 571 F.Supp.3d 77, 92 (S.D.N.Y. 2021); *Eshelby v. L'Oréal USA, Inc.*, 664 F.Supp.3d 417, 423 n. 4 (S.D.N.Y. 2023). Further, to the extent the 1994 power of attorney is filed in the Orange County court, as alleged in the Amended Complaint, this Court may take judicial notice of its content. Notably, the New York legislature did not amend the power of attorney form to include gift-giving power at all until 1996 (effective January 1, 1997) (N.Y. Gen. Oblig. Law § 5-1502M(1) (1996); *see also* 1996 Sess. Law News of N.Y. Ch. 499 (S. 4757–A) (McKINNEY'S).

[6] If the Court wishes to take judicial notice of the Defendant's in-court statement under oath stating the same, it can be provided.

by which he "gifted" Ms. Soudani's money to himself, the 1994 power of attorney referenced in the Complaint contained no such authorization.

In any event, Defendant's reliance on the 1994 power of attorney to justify taking Plaintiff's money for himself is absurd. "[A] power of attorney … is clearly given with the intent that the attorney-in-fact will utilize that power for the benefit of the principal." *In re Estate of Ferrara*, 7 N.Y.3d 244, 254 (2006), *quoting Mantella v. Mantella*, 268 AD2d 852, 852 (3d Dep't 2000). A presumption of impropriety attaches to self-gifts made by an attorney-in-fact to himself, and no gifts are permitted at all absent a specific provision in the power of attorney that authorizes gifts – which the 1994 power of attorney referenced in the Complaint did not include. *Choudhari v. Choudhari*, 220 A.D.3d 835, 837 (2d Dep't. 2023), *quoting Goldberg v. Meyers,* 181 A.D.3d 653, 654 (2020); *Anderson Marszal v. Anderson*, 9 A.D.3d 711 (3d Dep't 2004).

Further, in New York, a power of attorney is a fiduciary, who must avoid conflicts of interest, keep records of all transactions for the principal, avoid self-dealing, maintain strict standards of honesty, loyalty, and candor, and keep all of the principal's property separate from their own, including keeping the principal's money in a separate bank account. N.Y. Gen. Oblig. Law § 5-1505. Here, it is alleged that Defendant took a check for approximately $62,000, the proceeds of a car accident lawsuit, signed her name and his name to the check, and deposited it into an account that he controlled and to which Plaintiff did not have access. Am. Compl. ¶ 99. In other words, to the extent a 1994 power of attorney is relevant at all, the Amended Complaint alleges forcefully that Defendant acted contrary to his obligations pursuant to it.

### III.    THERE ARE NO "SCANDALOUS" ALLEGATIONS THAT SHOULD BE STRICKEN FROM THE AMENDED COMPLAINT (Responding to Defendant's Point IV)

Defendant argues that the Court should strike multiple paragraphs of the Complaint

pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. MOL at 8-9. In particular, he asks the Court to strike paragraphs 4, 5, 12, 23-26, 32, 34, 56-57, 62, 67-74, 103, and 109, and any other allegations that are "stated solely upon information and belief, and allege the defendant's financial relationship and murder of two former wives; physical assault of the plaintiff and her children; sexual assault of her children allegedly unknown until after October 2022" on grounds that such allegations are "scandalous, inflammatory, and prejudicial." *Id*. Defendant makes no specific claim as to any listed paragraph, other than to offer that "[a]s the Court can see in comparing these accusations to the enumerated causes of action, none are the least bit relevant." *Id.* at 9. Defendant's conclusory argument should be rejected.

Motions to strike are "not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Ulla-Maija, Inc. v. Kivimaki*, No. 02-CV-3640(AGS), 2003 WL 169777, at *4 (S.D.N.Y. Jan. 23, 2003) (internal citations omitted). Here, the complained-of allegations go to the matter's crux. The Amended Complaint alleges an ongoing, systematic course of sexual abuse against Plaintiff spanning 45 years. It describes the physical, psychological, and other injuries and conditions she suffered. She was beaten, she was isolated, and she was made economically dependent on her abuser. Until October 2022, she could not escape – in large part because she had nowhere to go thanks to Defendant's deprivations. Days before she left, Defendant raped her for the last time. After she left, he engaged in extortionate threats and other entreaties to obtain her return. It is true that the alleged facts are horrific and occurred over a long period of time  – but Defendant has no one but himself to blame.

Defendant lists specific paragraphs from the Amended Complaint he deems should be stricken. The complained-of paragraphs fall into two discrete buckets: 1) Plaintiff's belief that

Defendant murdered two women to whom he was married, and 2) allegations pertaining to the abuse of children who lived in the household, including both Defendant's children and Plaintiff's child.  These allegations are addressed in turn.

### A. Allegations Referencing Murder

From the list of complained-of allegations in the Amended Complaint (which Defendant does not bother to detail and provides scant argument to justify their removal), the following pertain to Plaintiff's belief that Defendant killed two of his wives:

> 5.  During the Relevant Period, Plaintiff believed that Soudani had murdered two women to whom he was married to recover insurance proceeds. She also observed Soudani threaten to kill Plaintiff's son on multiple occasions and, more than once, saw Soudani point a gun that she believed to be loaded at her and at her son.

> 23. Later in September 1977, Soudani's then-wife, Helen, was brutally murdered and found dead outside the restaurant that Soudani owned. Contemporary press accounts reported that Soudani was considered a suspect in the murder and had killed Helen to recover insurance proceeds. No one was ever arrested for Helen's murder.

> 24. At Soudani's instruction, Plaintiff provided the police with a false alibi statement regarding Soudani's whereabouts on the night of the murder. She did so because Soudani threatened to beat her severely if she refused. This act is the foundation of the fear and isolation that caused Plaintiff to remain with Soudani until October 2022 – in her mind Helen's death provided a clear model of what would happen if she crossed Soudani.

> 25. After Soudani's wife Helen was killed, in September 1977, Plaintiff dropped out of high school to care for Soudani's three sons. At the age of 17, she became the primary caregiver to the children and served as such throughout their childhood. Soudani was the only other adult in the residence.

> 26. About two or three months after his wife's murder, Soudani climbed into Plaintiff's bed while she was asleep and got on top of her. His penis was exposed. He touched her under her underwear. Plaintiff pushed him off and shouted, in substance, in Arabic, "what are you doing?" Soudani replied, in

14

substance, in Arabic, "I'm sorry, I thought you were Helen [Soudani's deceased wife]."

56.  Ruttkay lived in the 40 Bailey Road residence for over a decade and married Soudani in 2010. Plaintiff believes that Soudani married Ruttkay, who had a worsening heart condition and was receiving a pension from the New York City education system, in order to obtain her pension and Social Security benefits. Soudani took out a life insurance policy on Ruttkay and, after she passed away in October 2012, collected on the policy and continued to receive her pension and Social Security benefits.

57.  Plaintiff believes Soudani poisoned Ruttkay, causing her death. She did not report her suspicions to the police because she thought that no one would believe her, that making a report would result in retribution by Soudani against her son, and that making a report would result in Soudani escalating even further the physical and sexual violence against her.

62.  Plaintiff's fear was magnified by her belief that Soudani had killed two women and would not hesitate to kill her if she did not obey him and if doing so would suit his interests.

Am. Compl. ¶¶ 5, 23-26, 56-57, 62.

Contrary to Defendant's argument otherwise, the allegations serve a specific purpose: to explain, in part, the extent to which Plaintiff feared Defendant, and why she continued to submit to sexual abuse for her entire adult life. The allegation is not that "Defendant killed two women," but rather, "Plaintiff believed that Defendant killed two women, and that explains in part the fear she had of him, the power he maintained over her, and why she submitted to his sexual abuse for so long." As stated in paragraph 24, which Defendant would have stricken: "[t]his act [of providing a false alibi for Defendant] is the foundation of the fear and isolation that caused Plaintiff to remain with Soudani until October 2022 – in her mind Helen's death provided a clear model of what would happen if she crossed Soudani." *Id.* ¶ 24.

The paragraphs immediately preceding and following paragraph 62 (which Defendant asks

to be stricken) further make this point. As stated in paragraph 61 and paragraphs 63-66 of the

Amended Complaint – which notably are **not** included in the list of allegations Defendant would

see stricken:

> 61.    Plaintiff feared for her life during this period. She felt the threat of immediate death or serious physical harm before, during, and after each instance of the sexual abuse.

*Id.* ¶ 61.

Subsequent paragraphs of the Amended Complaint underscore why it contains references

to Plaintiff's belief that Defendant killed two women:

> 63.    In or about 1992, Soudani took an axe and destroyed the furniture in Plaintiff's bedroom, including the door, because he was angry with Plaintiff, causing Plaintiff to suffer fear of immediate death or physical harm, and causing her emotional anguish. The room remained without a door or bed for almost two years; Plaintiff used a sheet as a door and slept on a mattress on the floor.
>
> 64.    Soudani used threats of physical violence to socially isolate Plaintiff. If she socialized with other women, he called her a "whore" and other pejoratives and subjected her to physical abuse. He required Plaintiff to sit apart from other parents at school events, including but not limited to sporting events. Plaintiff was generally not allowed to leave the house to go shopping by herself. When Plaintiff did leave the house, Soudani timed her absences and regularly quizzed her or other household members about whether Plaintiff had spoken to anyone while out, and if she had otherwise "behaved herself."
>
> 65.    Soudani's efforts to control Plaintiff created a constant sense of isolation, fear of retribution, and a barrier to Plaintiff seeking help or reporting the abuse. Making a report would result in an investigation and, regardless of its outcome, the threat of a violent rection by Soudani would require Plaintiff to leave the residence out of fear of retaliation; at the time, prior to October 2022, Plaintiff had nowhere else to go.
>
> 66.    Soudani's sexual assault and battery and other acts of physical violence against Plaintiff have caused her, and continue to cause her, significant emotional and psychological distress and harm.

16

*Id*. ¶¶ 63-66.

**B. Allegations Referencing Abuse**

From the list of allegations about which Defendant complains, the following pertain to Plaintiff's observation of or reaction to abuse of others within the house:

> 4. Soudani also threatened and inflicted physical violence against Plaintiff, his own children and Plaintiff's child. On a regular basis, Soudani threatened to "beat the sh-t" out of Plaintiff and the children unless they complied with his directives, and often made good on the threat. During the period of the children's minority, Plaintiff observed Soudani hit the children with his hands or hard objects, causing the children to suffer intense pain, physical injury, and significant emotional distress. When Soudani bothered with a pretext to beat Plaintiff, he often claimed that Plaintiff had disobeyed him or failed to live up to his expectations.

> 12. After Plaintiff moved to Colorado, she was horrified to learn that Soudani had sexually abused both his son and her son during the Relevant Period, causing her to suffer additional emotional distress.

> 34. During this period, from 1977 to 1983, and throughout the part of the Relevant Period that encompassed the years of the children's minority, Plaintiff observed Soudani subject his three children to regular physical and psychological abuse, including screaming insults at the children, throwing physical objects at them, throwing them across rooms, and, on one occasion, holding one of the children by his feet and dunking his head in the toilet.

> 67. During the Relevant Period, when Soudani's own children were minors and her own son was a minor, Plaintiff witnessed Soudani's physical abuse of his sons and feared that refusal of Soudani's sexual demands would exacerbate Soudani's abuse of the children.

> 68. During the Relevant Period, after her own son had reached the age of majority and lived at the 40 Bailey Road residence, Plaintiff saw Soudani physically assault her son on a regular basis with his hands and with physical objects.

> 69. During the Relevant Period, when Soudani's own children were

minors, Plaintiff saw Soudani tie up his own children by the feet and hands as a punishment on multiple occasions.

70.     On one occasion during the Relevant Period, when Soudani's own children were minors, and Plaintiff's son was a minor, Soudani hit one of his sons with an axe, breaking the skin and causing a scar on his son's arm.

71.     During the Relevant Period, when Soudani's own children were minors and her own son was a minor, Plaintiff observed Soudani subject all members of the household to intense verbal abuse and threatened physical violence on a regular and continuous basis, causing the entire household to live in fear.

72.     Plaintiff's observation of the abuse, and the resulting knowledge that any challenge by her to his authority might result in Soudani's abusive retaliation against the children, constrained Plaintiff's ability to seek safety, report the abuse, or remove the children from Soudani.

73.     Plaintiff observed Soudani threaten to kill her son on multiple occasions.

74.     Prior to Plaintiff's escape in October 2022, Soudani's threats to her son's safety escalated. Plaintiff knew that, years earlier, Soudani had taken out a life insurance policy on her son's life. Now, Soudani suggested to Plaintiff in substance that it would be "easier" if Plaintiff's son was dead and suggested that Plaintiff kill her own son. Plaintiff was horrified and feared that Soudani planned to kill her son if he could not convince Plaintiff to do so. This fear was exacerbated because she knew that Soudani had received life insurance payments following the deaths of his wives, Helen and Elizabeth, and Plaintiff believed that Soudani had killed them both. Plaintiff's increasing fear that Soudani intended to kill her son contributed materially to Plaintiff's decision to leave Soudani's house in October 2022.

103.    Preceding their departure, the tension between Soudani and Plaintiff's son escalated, and on or about early October 2022 there was a violent interaction between Plaintiff's son and Soudani. For Plaintiff, the episode was the last straw. She believed that Soudani intended to kill her son, and that she had to take steps to remove herself and her son from Soudani's influence and abuse.

*Id.* ¶¶ 4, 12, 34, 67-75, 103.

Again, except for paragraph 12, the allegations Defendant would see stricken refer to Plaintiff's own observations and inferences – contrary to Defendant's broad statement otherwise, the allegations are not made on "information and belief.". Ms. Soudani's observations informed not only her decision to remain in the house, and subject to Defendant's sexual abuse, but also evidence the intentional infliction of emotional distress she suffered at Defendant's hands. Notably, although Defendant does not specifically include it in his list of allegations to be stricken, Plaintiff's belief that the Defendant maintained political influence in the community further influenced her decision not to report.[7]

Paragraph 12 refers to facts Plaintiff learned after she escaped to Colorado, i.e., that Defendant sexually abused both her son and his own son during their minorities. The knowledge compounded Plaintiff's already significant emotional distress.

## C. Other Allegations

Defendant specifies two other allegations in his list, found in paragraphs 32 and 109 of the Amended Complaint. He provides no specific argument why either should be stricken. In any event, both allegations are relevant and should remain in the Amended Complaint.

### a. Paragraph 32

32. As a result of the rape, Plaintiff suffered physical pain, bleeding, and soreness. Plaintiff was also in despair: she believed that her life was ruined because no one would ever agree to marry her because she was no longer a virgin. Plaintiff's shame because she was no longer a virgin and, in her mind, no longer acceptable for marriage, as well as the threat of retaliatory physical

---

[7] Paragraph 94 states: During the Relevant Period, including within the last five years, Plaintiff observed Soudani issue cash loans to individuals, including local political officials. Plaintiff saw Soudani put cash in the hands of multiple individuals, and Soudani required her to keep track of the loan repayments. Plaintiff concluded based on her observation of this activity that Soudani was able to influence decisions made by local officials. These observations and the inferences she drew from them contributed to her conclusion that no one would believe her if she reported Soudani's abusive conduct to the authorities. Am. Compl. ¶ 94.

harm to her and the children, made it impossible for her to report what had happened.

*Id.* ¶ 32.

The paragraph contains specific allegations of the physical pain and emotional suffering that resulted from Defendant's rape of Plaintiff. It contains further allegations regarding her emotional shame and pain, stemming from her belief that she could no longer get married, and the threat of retaliation against her and the children if she reported the rape. The allegation is directly relevant to the causes of action, including the Unjust Enrichment claim, as it goes directly to Defendant's motive and opportunity to steal Plaintiff's money.

### b. Paragraph 109

Defendant complains that the Amended Complaint describes his report to local law enforcement regarding Plaintiff's son's alleged theft from him, and mentions that her son was arrested and charged with a crime.[8] These allegations form the basis of Defendant's counterclaim, wherein he alleges that Plaintiff acted in concert with her son to steal the money (notwithstanding that she was never so charged and, in fact, the only charges brought against her were dismissed). The paragraph is relevant because it explains the context of Soudani's subsequent extortionate threats, which are themselves relevant to Plaintiff's emotional distress, and provide significant insight into the nature of the interactions between Plaintiff and Defendant and the language he used when addressing her.

---

[8] The Court may take judicial notice that, on November 28, 2023, Martin Soudani, Plaintiff's son, pled guilty to Grand Larceny in the Third Degree under Penal Law 155.35(1) and that, on March 6, 2024, he was sentenced to an indeterminate prison term of from one to seven years. Martin Soudani also made restitution of $478,286.42.

## **CONCLUSION**

For the reasons stated, this Court should deny Defendant's Motion to Dismiss in its entirety.

Dated:

New York, New York
May 20, 2024

         Respectfully submitted,

         LEWIS BAACH KAUFMANN
         MIDDLEMISS PLLC

         By: /s/ Arthur D. Middlemiss
         Arthur D. Middlemiss
         Arthur.Middlemiss@lbkmlaw.com
         Marc Scholl
         Marc.Scholl@lbkmlaw.com
         10 Grand Central
         155 East 44th Street, 25th Floor
         New York, NY 10017
         Telephone: (212) 826-7001
         Facsimile: (212) 826-7146

         *Counsel for Plaintiff and Counterclaim-*
         *Defendant Eman Soudani*