# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————x
EMAN SOUDANI,

                    Plaintiff,

          v.                          23 CV. 9905 (PMH)

MOUT'Z SOUDANI,

                    Defendant.
———————————————————x
                    U.S. Courthouse
                    White Plains, N.Y.
                    March 27, 2024
                    12:00 p.m


BEFORE:      HON. PHILIP M. HALPERN
             United States District Judge




APPEARANCES:

LEWIS BAACH KAUFMANN MIDDLEMISS, PLLC
BY:  MARC F. SCHOLL, Esq.
155 E. 44th Street, 25 Floor
New York, N.Y.  10017
Attorney for Plaintiff

HODGES WALSH & BURKE, LLP
BY:  MICHAEL K. BURKE, Esq.
55 Church Street, Suite 211
White Plains, NY 10601
Attorney for Defendant



Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

1          THE CLERK:  In the matter of Soudani against
2    Soudani.  Can counsel please note your appearance for the
3    record starting with Plaintiff.

4          MR. SCHOLL:  For the Plaintiff Eman Soudani, Marc
5    Scholl, with the firm Lewis Baach Kaufmann Middlemiss.

6          MR. BURKE:  Good afternoon, Your Honor.  Michael
7    Burke, Hodges Walsh & Burke, on behalf of Mout'z Soudani, the
8    Defendant.

9          THE COURT:  All right.  Counsel, good afternoon.
10         Please be seated.

11         All right.  I've read the various letters concerning
12   these subpoena, and as I get the global picture, Mr. Burke
13   became a late entrance into this subpoena issue, because his
14   client had not authorized him to represent him.  And, so, Mr.
15   Burke has now come in and said, "give me a chance to respond
16   to the document production and this may obviate the need for
17   the subpoena."

18         So, I looked into this, and, very frankly, I think
19   the subpoena requests an awful lot of material, and I want to
20   understand why the Plaintiff's document request and subpoena
21   request for not in haec verba the same pieces of paper, but
22   generically the same pieces of paper.  A lot of the time
23   frames are different.  Is there something I'm missing or are
24   we fooling around here with a nonparty subpoena —

25         MR. SCHOLL:  No.

1                    THE COURT:  —— trying to get more than we can get?

2                    I don't understand it.  So, let's do one at a time,

3        and with the backdrop that the Amended Complaint, as I read

4        it, has four claims, although the first and the second are the

5        same.  They're battery claims.  Whether it's sexual abuse or

6        physical abuse, that's a one-year statute of limitations,

7        right?

8                    And the infliction —— potential infliction of

9        emotional distress, the fourth one, that's a one-year statute

10       of limitations.

11                   And the third claim, unjust enrichment, I think is a

12       six-year statute.  I may be wrong about that.

13                   MR. SCHOLL:  Your Honor, on the sexual abuse and the

14       other —— on the other battery, because of state law, the

15       statute of limitations were opened up, and it is our position

16       that they opened up and allowed for other claims that could

17       have been brought as well.

18                   THE COURT:  Well, you may be right or you may be

19       wrong.  I don't know the answer to that.

20                   MR. SCHOLL:  Okay.

21                   THE COURT:  But I'm just trying to get a feel for

22       the relevant time frame.

23                   MR. SCHOLL:  Sure.  Well, for the relevant time

24       frame, there are two Trusts, Your Honor.

25                   THE COURT:  Well, the Trusts are not parties to this

1  proceeding.

2          MR. SCHOLL:  That's why we had to use a subpoena,

3  Your Honor.

4          THE COURT:  Yeah, I know.  I've been around the

5  block.

6          MR. SCHOLL:  I'm saying that that's why they had to

7  be used for that, and the Trusts — what is part of the Trust

8  is relevant both to our claims and also to the counterclaim,

9  specifically, related to the 1.6 million of the source of

10  funds with respect to that and whose money it was.

11          THE COURT:  Well, I don't — you're saying it's

12  relevant and I'm saying, you know, I don't know that it's

13  relevant.

14          MR. SCHOLL:  Right.  I know that.  I know that.

15          THE COURT:  But we're going to do this my way, so

16  let's first talk about the time frames.

17          In your subpoena, you ask — and we'll do the

18  Grantor Trust first.  You asked for documents from September

19  21, '17 to the present.  In your document request to the — to

20  the Defendant, number 10, you asked for, essentially, for the

21  same financial records from August of '77 to October of 2022.

22  And, so, my first question that I need an answer to is:  Why?

23  Why are those time frames different?

24          MR. SCHOLL:  Well, for the documents production, I

25  think it's dealing with a series — and if I can pull that

1    out.  We are talking about multiple, whatever might exist for

2    that time frame.  The Grantor Trust only came into existence,

3    as far as we understand, in 2017.

4              THE COURT:  So —

5              MR. SCHOLL:  So, it doesn't exist —

6              THE COURT:  — then your document request number

7    10 —

8              MR. SCHOLL:  Okay.  Let me locate it, Your Honor, if

9    I may.

10             THE COURT:  Sure.  It's annexed to —

11             MR. SCHOLL:  Yes, I understand.

12             THE COURT:  — Mr. Burke's letter.

13             MR. SCHOLL:  Right.

14             THE COURT:  Number 10 asks for stuff back to '77, so

15   that's gotta be a mistake.

16             MR. SCHOLL:  Well, no, because there were

17   other — it asks for — with respect to other Trusts, with

18   respect to Mout'z, the Defendant himself.  The time frame

19   that's covered for the document production request is not

20   limited to the Grantor Trust.

21             THE COURT:  No.  I think the individuals — the

22   statements you're looking for are a variety of statements, but

23   you've subpoenaed the Grantor Trust.

24             MR. SCHOLL:  Yes.

25             THE COURT:  And the subpoena for the Grantor Trust

1    asked for documents from September of '17 to the present.  And

2    the document request asks for financial material, transfer

3    documents ——

4              MR. SCHOLL:  Right.

5              THE COURT:  —— from August of '77.

6              MR. SCHOLL:  Yes.

7              THE COURT:  So that period of time may impact the

8    Defendant himself and it may be different.  But you're not, as

9    it relates to the Grantor Trust, asking for documents in your

10   lawsuit from the Defendant beyond September of '17, right,

11   because the Grantor Trust was not in existence?

12             MR. SCHOLL:  They certainly can't produce documents

13   that don't exist, Your Honor.

14             THE COURT:  Right.  Okay.  So, what's wrong with ——

15   and, I guess, let's do the other one.  The Irrevocable Living

16   Trust subpoena asks for documents from February 11, 2022 to

17   the present; whereas, when you ask the individual, you're

18   asking him for the same August '77.

19             MR. SCHOLL:  Again, request 10 applies to multiple

20   things, including the Defendant himself, so that those are

21   listed as part of what ——

22             THE COURT:  Well, you're asking him to produce

23   documents that are within his possession should he have them,

24   but ——

25             MR. SCHOLL:  But just talking about ——

1              THE COURT:   -- what I'm trying to understand is --

2              MR. SCHOLL:  Yes.

3              THE COURT:   -- why is the document request and the

4    subpoena different?

5              MR. SCHOLL:  Well --

6              THE COURT:   In other words, I'm -- we're going to

7    adjudicate this this morning and we're going to be done with

8    it.  And what I'm anticipating is that you're going to have

9    your next discovery dispute because of these dates, and, so, I

10   want to cut that off, because you two need to get along and

11   not create discovery disputes with me that you don't need to

12   create, because I'm just going to take the rules off the shelf

13   and apply them to the questions --

14             MR. SCHOLL:  Understood.

15             THE COURT:   -- the issues you raise.

16             MR. SCHOLL:  Going back to the Irrevocable Trust,

17   the reason why the subpoena focuses on that date is that

18   that's I believe the creation of the Irrevocable Trust.

19             THE COURT:  I got it.  Okay.

20             MR. SCHOLL:  All right.  So, the subpoenas --

21             THE COURT:   Just so we're clear, what we're saying

22   to each other is, is that, when you go back and do your

23   discovery on your document request, you believe that these

24   dates set forth in the subpoena -- as opposed to the dates

25   that apply to the Trust and the individual -- are appropriate,

1    right?

2            MR. SCHOLL:   I will believe the subpoena dates are

3    the most accurate dates —

4            THE COURT:   Yes.

5            MR. SCHOLL:   — in terms of the particular items.

6            THE COURT:   All right.  Fair enough.  Fair enough.

7            Now, let's just stop for a second.

8            Mr. Burke, your client received the subpoenas,

9    didn't do anything with them, and, so, my inclination is to —

10    because they're subsumed in the document demand, if you can

11    assure me that your client has responsive documents, your

12    Trust clients have responsive documents, I think we'll just

13    fold this into your good suggestion that you produce them in

14    connection with your document response.

15            Now, if your document response is going to be a

16    series of objections and we're not going to get anywhere,

17    we're going to procrastinate, then I'll deal with these

18    subpoena today and I'll issue an order.

19            MR. BURKE:   Your Honor, if I may.

20            THE COURT:   Yeah.

21            MR. BURKE:   I believe he does have some responsive

22    documents to the parameters of 2017 forward in relation to the

23    Trust.  However, and I've relayed this to counsel, when their

24    client stole the over $500,000 from the safe, that's also

25    where the Trusts were contained and those were taken as well.

1    So, it's our position she is in possession of that.

2          But, even more importantly, in their 26(a)

3    disclosures, they identify that the discovery that they've

4    received, both the Plaintiff and her son, from the D.A.'s

5    Office, which includes a lot of the records that they're

6    seeking here, because they did the investigation and

7    prosecuted the son for the $1.6 million theft from the Trust.

8    So, it's our understanding they have that discovery.

9          I've also come to learn that the attorney that

10   drafted the Trust testified in the grand jury and introduced

11   the Trusts, so they have that as well.  But I will once — I

12   don't have that discovery, because I wasn't a party to the

13   prosecution.  It's referenced in the 26(a)'s.  We've asked for

14   production of what they received from the D.A.'s Office and

15   we're awaiting the complete response to that.  And once we get

16   it, I think we can just say, "all right, you have this."

17         I think — it doesn't seem to make sense that we

18   reproduce what they already have, if I can compare that, but

19   we'll do whatever the Court wishes.

20         THE COURT:  No, no, no.  In a scenario like this,

21   Mr. Burke, that they may or may not have documents is, is —

22   unless it becomes abusive or burdensome — is not a legitimate

23   way to object to a document production.

24         In other words, if your client is in possession of

25   documents responsive to the request, then your client needs to

1    produce documents responsive to the request, period.

2              MR. BURKE:  Understood.

3              THE COURT:  And what I'm talking about right now are

4    the two subpoenas.  The document request is not before me, but

5    I thought it was a good suggestion that we deal with this in

6    connection with that.

7              Now, if there are documents — and my sense here is,

8    there's a fairly good undercurrent going here between the

9    Plaintiff and Defendant in terms of the emotional animosity,

10   the hate, whatever it is that's driving this, let me urge both

11   of you, lose that thinking when it comes to litigating my

12   case.  I will not do well with you and, more importantly, you

13   will not do well with me if you don't get along with your

14   adversary, period.  There is no reason for you to adopt the

15   animus of the client here.  You have a job to do, do your job.

16             So, if Mr. Burke is asking you to produce documents

17   that are responsive already to your request, he'll do that.

18             MR. SCHOLL:  Okay.

19             THE COURT:  But you need to do the same thing and

20   you need to do it in a timely way.  In other words, if you

21   have documents from the grand jury or from the D.A. or

22   whatever is going on here — I'm not sure I have a full grasp

23   on this case yet, but I've read the Complaint and I read the

24   counterclaim, and so, quite clearly, somebody is mistaken

25   here, right?  Somebody is mistaken.

                    Sue Ghorayeb,  Official Court Reporter

1              But if your point, Mr. Burke, is, "oh, they took my
2    documents, so I don't have my documents," then you'll say that
3    and that will be your response.  But if you have additional
4    copies of the documents —
5              MR. BURKE:  Understood.
6              THE COURT:  — in your possession, yeah, you should
7    produce them.  Okay?
8              MR. BURKE:  Yes, Your Honor.
9              MR. SCHOLL:  Your Honor, may I speak for a second?
10             THE COURT:  Yes.
11             MR. SCHOLL:  I mean, one of our concerns will be
12   that a response will be "I don't physically have them, but I
13   haven't checked with my accountant for the tax returns.  I
14   haven't checked with the lawyers that handled the Trusts."
15             THE COURT:  Mr. Burke is an entirely capable lawyer.
16   He's been in my courtroom —
17             MR. SCHOLL:  I'm not talking about Mr. Burke.
18             THE COURT:  — a million times.
19             MR. SCHOLL:  Right.
20             THE COURT:  He'll advise his client properly.  If
21   the client doesn't comply, I mean, you'll make your
22   appropriate application to me.
23             MR. SCHOLL:  I'm just talking about whether that
24   possession includes constructive possession.
25             THE COURT:  Possession, custody and control is what

1   the federal rule — what the case law interpreting those words

2   means.

3           MR. SCHOLL:  Right.

4           THE COURT:  I'm not here to give you legal advice or

5   Mr. Burke.  If he has the opportunity to produce these

6   documents, he knows well enough what to do.  You don't have to

7   educate Mr. Burke, Trust me.  He is an experienced trial

8   lawyer both on the civil and criminal side, and I've seen it

9   myself.  He knows exactly what he's doing, and he knows me

10  well enough to know that I won't do well with his client if

11  his client is fooling around.  So, I wouldn't worry about that

12  too much with Mr. Burke.

13          On the other hand, you know — let's take a simple

14  example.  A credit card bill, I don't think it's required

15  under the Federal Rules, unless you could educate me, that if

16  the — if the Defendant said, "you know, I threw them all

17  away," or "the Plaintiff took all my copies of the credit card

18  bills," I don't — I don't know that the Plaintiff has to then

19  go to the credit card company and say, "would you give me

20  credit card bills back to 1977."  I don't know that the law

21  requires that.  I'm not saying it doesn't, I'm saying I don't

22  know that it does.  On the other hand, if we're within a one

23  year or five-year or six-year statute of limitations period,

24  you know, I think that might be — that might be something

25  that I would enforce.

1          MR. SCHOLL:  But I do think, Your Honor, that what
2    might — one has online access to one's credit card or bank
3    account, that one could download those statements without the
4    need potentially — you know, the Plaintiff can always go and
5    subpoena a credit card company, if we know the credit card or
6    the bank.

7          THE COURT:  Well, let me ask you this.  Let me ask
8    you this, Mr. Scholl.

9          MR. SCHOLL:  Sure.

10         THE COURT:  Do you have a lot of these documents, as
11   Mr. Burke indicated?

12         MR. SCHOLL:  We have what purports to be the actual
13   Trust documents for the Irrevocable and we have what purports
14   to be — and I say purports to be because there's a question
15   of whether or not it was fully signed — to be what's called
16   this Grantor Trust.

17         THE COURT:  Are there signatures on the document?

18         MR. SCHOLL:  That's —

19         THE COURT:  There are or there aren't.

20         MR. SCHOLL:  There are or there aren't, as Your
21   Honor, but the — for example, the Grantor Trust apparently
22   wasn't fully notarized.

23         THE COURT:  Okay.

24         MR. SCHOLL:  And there's a question of whether or
25   not it was fully signed.

1              THE COURT:  Okay.  Those minutia we don't need right
2     now —
3              MR. SCHOLL:  No, I understand.
4              THE COURT:  — prior to exchange of documents.
5              So, what I think I will do — do you agree with me,
6     Mr. Scholl, that the responses that Mr. Burke's client will
7     give to document request 10, 26 and 27 encompass your document
8     requests to both the Grantor and the Irrevocable Trust?
9              MR. SCHOLL:  I don't know that they do.  I —
10             THE COURT:  Because we're going to get to it right
11    now.
12             MR. SCHOLL:  Right.  I say that because those are
13    three that deal with general requests about certain financial
14    information about the Trusts.  But there is a more detailed
15    specification in the subpoenas, such as communications with
16    the accountant, that might not be interpreted as fully
17    encompassed by requests for tax returns.
18             THE COURT:  Mr. Burke, there's nothing here that
19    seems overly burdensome to my eyes, and, so, what I'm hoping
20    we can do is:  To the extent that Mr. Scholl makes the point,
21    "Judge, there may be a few categories of documents, like
22    accounting" — I don't know whether there's an accounting
23    privilege —
24             MR. SCHOLL:  Well —
25             THE COURT:  — issue.  There may be a lawyer

1    privilege issue.  I don't — put the privilege aside.

2            But what I'm anticipating is that in connection with

3    your production of the Plaintiff's requests of the Defendant,

4    you can address yourself to the subpoena — subpoenae, both of

5    them, and produce at the same time whatever documents you have

6    that are responsive.

7            I'm looking and I don't have a good enough handle to

8    know whether there's anything that is burdensome here.  It

9    looks to me like the Plaintiff is trying to understand what

10   the Trust owns and what monies it had and where the monies

11   went, generally.

12           Is that the idea here, Mr. Scholl?

13           MR. SCHOLL:  Yes.  Also, I should point out that,

14   that these — at least, the Irrevocable Trust apparently was

15   what most — what bank accounts were titled in and were

16   treated, and part of the issue of the Complaint goes to

17   "family money,"  that that's how the accounts were held,

18   that's how the funds were held.

19           And you raised the account — possibility of

20   accountant privilege, I will point out that that was one of

21   the reasons why the Plaintiff — we were being very careful to

22   see if we can get tax returns, for example, without having to

23   try to get an order from the Court with the accountant.

24   That's why — one of the reasons why we initially went through

25   nonparty subpoenas, and then we have — actually, since we

17

1    haven't gotten — didn't get compliance with the subpoenas, we

2    added them to the document production, because we would have

3    to make a showing to Your Honor if we wanted to subpoena the

4    accountant himself for tax returns.

5            THE COURT:   Yes.   I mean, there's also a request for

6    tax returns here.

7            Do you have a protective order in place yet?

8            MR. BURKE:   That was one thing I was going to bring

9    up.   We did have discussions.   We would want to have a

10   protective order in place.   The Court has the standard that

11   you use.   We had those discussions of including that as part

12   of —

13           THE COURT:   Prepare it, sign it and I'll sign it.

14           MR. BURKE:   Fine.   I will speak to counsel and we'll

15   hammer that out to make sure that we have a protective order

16   in place.

17           Your Honor, if I may suggest — the Plaintiff claims

18   in essence two different buckets of monies that went into

19   these Trusts, her SSI payments and the payment from a

20   settlement.   I don't believe that they should be entitled —

21   and this is addressed to the scope — that they should be

22   entitled to everything else that goes into the Trust if those

23   are the only two sources of monies going into that Trust that

24   they're making allegations about.

25           So, in essence, if she started receiving SSI

1    payments in 2019, she shouldn't be able to receive discovery

2    related to the Trust prior to that.  If she had a settlement

3    in 2019, she shouldn't be able to.  So, I don't know

4    off-the-top of my head when both of those things happened, but

5    I can look at the Complaint and see what the Plaintiffs

6    allege.  But I don't think it should be where they get

7    everything from the Trust that's responsive if their

8    allegations are only tied to those two events.

9              THE COURT:  You know, in my desire to move this

10   along, I don't like discovery disputes with lawyers that have

11   as much gray hair as I have, because it's a sign to me that

12   you both know exactly what you're doing, and I don't want

13   to — I don't want to run a kindergarten here for unnecessary

14   disputes.

15             If you have legitimate disputes, I'll rule on them,

16   but this feels like — and I'm also thinking to myself, now

17   you haven't really met and conferred, and you haven't really

18   tried to resolve these issues before you got to me.

19             MR. BURKE:  Correct.

20             THE COURT:  And, so, look, if there is a claim

21   here — is there some other claim other than the Social

22   Security and the settlement monies?

23             MR. SCHOLL:  That seems — the claim here has, has

24   to do with the fact that this was in essence a family since

25   1977.  It was in essence a family since 2002.  It was in

1    essence a family and the funds — and the reason I say that is

2    that what is being now treated as the Trust was what was being

3    treated as the family funds.  Mom wasn't being paid for

4    working for, for businesses that the Defendant had.  Monies

5    that were going into this — bank accounts labeled as Trusts

6    were basically being treated as this is our family money.  The

7    actual beneficiary —

8              THE COURT:  That's why you have lawsuits for.  Do

9    you have a lawsuit for family money here?  What is it?

10             MR. SCHOLL:  The lawsuit has to — the lawsuit does

11   describe in terms of during the time — this is evident —

12   this is evidence of her, her abuse and control — the control

13   over her during that time.

14             I also point out that the Trust's beneficiary — the

15   Irrevocable Trust's beneficiary is her son.

16             THE COURT:  Yeah, but — so, let's, let's tie your

17   requests to your claims for relief.

18             MR. SCHOLL:  Sure.

19             THE COURT:  And if you're thinking that you're going

20   to go outside the footprint of the claims for relief —

21             MR. SCHOLL:  No.

22             THE COURT:  — the answer is:  I won't permit it.

23             MR. SCHOLL:  No.

24             THE COURT:  I'm not going to permit that.

25             MR. SCHOLL:  Mm-hmm.

1              THE COURT:  It feels a little like this could turn

2    into a fishing expedition quickly.  I'm not going to permit

3    that.  So, if you have an unjust enrichment claim that he has

4    monies belonging to her, then you're entitled to find out

5    whether in fact that's proven.  But if you're thinking that

6    you can broaden that request to something other than the

7    elements of your claim for relief, I'm not going to permit it.

8              MR. SCHOLL:  Also, I would say, it's also relevant

9    to the defense to the 1.6 million counterclaim.

10             The 1.6 million counterclaim, the source of those

11   funds are the Trusts.

12             THE COURT:  I thought it was in a vault or a safe.

13             MR. SCHOLL:  No, that's the alleged, that there were

14   two safes in the — in the house that, that, that the

15   Plaintiff was alleged to have rifled through, but the County

16   dropped the charges.

17             THE COURT:  If your point is that a factual defense

18   exists to the "taking, stealing" — whatever you want to say

19   it — "the 1.6," and the defense is, "no, no, no, that was my

20   money, that was the family money," that's plausible.

21             MR. SCHOLL:  Yes.

22             THE COURT:  It's plausible, Mr. Burke.  And, so,

23   that may require you to produce additional monies —

24   additional documents concerning those monies beyond the Social

25   Security, beyond the 60,000, whatever it is, settlement.  But

1    that's a finite quantity of documents too.

2            MR. BURKE:  Right.  And I believe, although I

3    haven't seen it, from my understanding, he was — you know,

4    the D.A.'s Office did the detailed investigation of these

5    transfers going to the son, where he set up a phony website

6    saying, "here's the 10 percent return you're getting on these

7    monies," it was all bogus.  He stole 1.6 million and it shows

8    that the monies on occasion being transferred from the

9    Trust — I don't disagree with that — based on false

10   representations by the son, but those are also much later in

11   time where the assets were there.

12            So, it gets back to — from their perspective,

13   what's their claim that she put into that Trust, not what's

14   the claim that came out of it, because that I think has

15   already been — he pled guilty.  He admitted that he stole

16   1.6 million.  So that's that, you know, he's already been

17   sentenced.  So, I don't think that's even an issue.

18            THE COURT:  Well, they want the money back.

19            MR. BURKE:  We want the money back — he, he —-

20            THE COURT:  So, what kind of a defense are you

21   trying to mount, Mr. Scholl?

22            The son pled guilty.

23            MR. SCHOLL:  Well, the son pled guilty to a

24   D felony.

25            THE COURT:  I don't care what he pled guilty to.

1            MR. SCHOLL:  In terms of — in terms of the so

2    called — of the so called 1.6, there are two points I want to

3    make.  The first point is, if the funds — and just because

4    the son pled guilty — if the funds —

5            THE COURT:  Does that mean he didn't steal the

6    funds?

7            MR. SCHOLL:  No, no.  The funds came from an account

8    in which he was the beneficiary of the Trust that had combed

9    the funds.  There is a question there regardless of whether or

10   not it was mounted by the son's lawyer.

11           Second of all, the sources of the funds —

12           THE COURT:  If he pled guilty, he pled guilty.  I'm

13   going to take an adverse inference and I'm going to hold it

14   against him or the jury will.

15           MR. SCHOLL:  Against him, certainly, but not against

16   the question of whether or not the funds, if taken, were

17   stolen, and whether or not the sources of the funds were from

18   legitimate sources, and whether or not, in point of fact, the

19   question on the — on the table there has to do with the fact

20   that about half a million dollars was actually returned from

21   this cryptocurrency investments to, to the Defendant by the

22   Orange County District Attorney's Office, not mentioned in, of

23   course, the counterclaim.

24           THE COURT:  All right.  So, here's what we're going

25   to do, because I don't — I'm not going to do this for much

1   longer ──

2            MR. SCHOLL:  Right.

3            THE COURT:  ── today.  Here's what we're going to

4   do.  Number 1, you'll meet and confer and you will put your

5   heads together.  There isn't going to be a fishing expedition

6   here.  If you can't agree, then you'll look at my rules,

7   you'll write me together a joint one five-page letter

8   explaining what you can't agree on, and I'll bring you back in

9   in person to address that.

10           For now, I think what I'm going to do is ask, Mr.

11  Burke, in connection with your response and/or production of

12  the documents that you have been asked to produce, Plaintiff

13  to Defendant, the document request, you'll prepare a response

14  to the ── each of the subpoenas and you'll either produce or

15  object.  My advice would be ── you heard what I said today ──

16  I wouldn't object to something that I'm going to overrule your

17  objection on.  On the other hand, if you can't agree on this

18  framework, you can write to me.

19           So, to the extent that Mr. Burke has shown up late,

20  because his client hired him late to respond to the subpoenas,

21  I'm directing him to respond at the same time he responds to

22  the Plaintiff's document demand, number 1.

23           Number 2, I'm directing that you meet and confer to

24  reduce and/or eliminate the issues in connection with both

25  subpoenas and the document request, which I see is going to

1    become an issue as well.

2              If you can't agree, be really sure you can't because

3    it's — discovery disputes here, nobody walks away happy, I

4    promise you.  Please do your best to agree, and if you can't,

5    use my rules, write me a letter, and I'll bring you in for an

6    in-person conference and I'll rule on the requests you've

7    made.

8              It seems, it seems to me that, just superficially,

9    if the young man pled guilty to stealing money, the money is

10   stolen.  There isn't a whisper of a fault in my mind that

11   somehow he could mount a defense now to, to not being liable

12   for the money he stole.

13             MR. SCHOLL:  What I'm asking him to —

14             THE COURT:  He has to be liable for what he stole,

15   right?

16             MR. SCHOLL:  But he is not a party here.

17             THE COURT:  Huh?

18             MR. SCHOLL:  He is not a party here.

19             THE COURT:  I get it.  No.  I get it.

20             MR. SCHOLL:  And there is a second question because

21   of what he pled to did involve a lesser offense that was

22   added, there is some question about — and this is, this is

23   detailed and I'm sure Your Honor is not interested in knowing

24   that he diverted some of his investment to a woman in Russia.

25             THE COURT:  Well, all of that is interesting, but

1    this is between the Plaintiff and the Defendant.

2            MR. SCHOLL:  Right.

3            THE COURT:  Right?  And, so, the Defendant is

4    claiming that Plaintiff owes the 1.6.

5            MR. SCHOLL:  Right.

6            THE COURT:  And it may be that the son stole the

7    money, as you said, and the Plaintiff had nothing to do with

8    it, and, therefore, the counterclaim is going to fall by the

9    wayside.  It may very well be.  I don't know enough about this

10   case to be dangerous yet, but here is what I do know.  There's

11   a lot going on here just on the document production, get to

12   it.  Let's get — we've had a conference and you have a

13   scheduling order in place, right?

14           MR. SCHOLL:  Yes.

15           THE COURT:  So, don't think that we're going to

16   extend discovery because you're fighting, quite the opposite

17   will happen.  So, please, get along.  You're both entirely

18   capable.  Strip this to what this lawsuit is about before me,

19   not some other lawsuit, some other people, some other things.

20   It's only going to be as to this, and you're not going to get

21   to — either of you for that reason — for that matter are

22   going to have a fishing expedition, use this as a platform to

23   bring other lawsuits based on information that you get here,

24   that's not going to happen.  All right?

25           So, please get along.  My rule is very clear.  It's

```
 1   a one letter, joint letter, if you can't get along.

 2              All right.  Is there anything else we need to do

 3   today?

 4              MR. SCHOLL:  No.

 5              MR. BURKE:  No, Your Honor.

 6              THE COURT:  All right.  Take good care.

 7              MR. BURKE:  Thank you, Your Honor.

 8              THE COURT:  All rise.  Court in recess.

 9              (Case adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```